ATLANTIC COTTON MILLS *vs.* INDIAN ORCHARD MILLS.

Suffolk.    March 21, 22, 1888. — June 20, 1888.

Present: MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Corporations — Common Agent — Knowledge — Notice — Payment — Negligence.*

The common treasurer of two corporations, to make good his deficit to one, drew checks upon the other payable to the order of the first, by which the money was drawn and used, no other officer of either knowing the facts. He charged himself upon a private memorandum with a part of the money, and falsely entered the remainder upon the books of the corporation upon which the checks were drawn as loans to a third person, from whom it made an attempt to collect it. *Held,* that the corporation using the money was affected with his knowledge, and the transaction did not amount to a payment of the deficit; and that the other corporation was not guilty of such negligence as to preclude it from recovering back the money.

CONTRACT to recover the balance of a mutual account between the parties. The defendant filed a declaration in set-off, to diminish such balance. Trial in this court, without a jury, before *Devens,* J., who reported the case for the consideration of the full court. The case was submitted upon an auditor's report as an agreed statement of facts, in substance as follows.

The two corporations had had business relations with one another for many years, during which the respective treasurers had lent the funds of each to the other by means of the checks of one in favor of the other. The directors of each corporation had never by vote expressly authorized such loans, but the facts were known to them, and the loans impliedly sanctioned by them. William Gray, Jr., who had become the treasurer of

both corporations, continued this practice of mutual lending; and the plaintiff's claim was for a balance of $365,500 upon this loan account, as appeared by its books. The defendant contended that it was entitled to recover upon its declaration in set-off the sum of $219,114.48, and therefore owed the plaintiff only $146,385.52, and this was the question at issue.

Besides the legitimate dealings between the two companies, all of which were conducted and recorded under Gray's orders, Gray took moneys from both, from 1881 to August 14, 1886, for his own use. Every six months, when the accounts of either company were to be made up, he transferred to that company from the treasury of the other the amount necessary to make his cash account good. These transfers were made by checks of the one mill to the order of the other, made in precisely the same manner as the legitimate transfers of cash from one to the other, and entered in the same manner on the check and stub books of both companies. The transfers were not made by single checks for the amount of the deficiency, but generally by several checks running over a considerable period, and undistinguished from the legitimate payments by one mill to the other during such period, except by the failure to post them from the check-books to the cash-book and ledger.

The mode of committing and concealing the frauds was, to some extent, different in the two cases; but evidence of every transaction was preserved, and every dollar taken could be accounted for. The facts appear upon the check-books of both companies, in which the stubs show that the money taken by Gray was taken by checks to his own order, and the money transferred from one company to the other was always by checks payable to the order of the company receiving it. There were, besides, private memoranda, kept by the book-keepers of the two companies, which had been preserved.

Each company was in the habit of appointing annually a committee of stockholders to examine the accounts, with authority to employ an expert, the same expert being employed by both, and his examinations being adopted. He examined the accounts usually on or about the days when they were made up, but occasionally at other times, and the committees reported to their respective companies at the successive annual meetings. No

officer of either company, excepting Gray, knew of his frauds. They were known to the book-keeper of each company, and upon the evidence, the private accounts were known to the expert, but he was not called as a witness. All the entries on the check-books and on the private memoranda were made by the respective book-keepers by order of Gray.

In the case of the Atlantic Cotton Mills, Gray would take money from that corporation and enter it on his memorandum, no other entry being made except on the stubs of the check-books. Upon this memorandum he would charge himself with all these sums, and would credit himself with payments which he, from time to time, made by deposits to the credit of the companies, and with the amount of his salary. The memorandum was treated as cash, and the discrepancy could not be discovered except by a comparison of the cash on deposit with the amount required by the cash-book, or of the cash-book with the check-books, which the plaintiff contended should have been done. The accounts of this company were made up to the fifth days of June and December in each year, and before those dates Gray would cause to be transferred to this company, from the cash of the defendant, from time to time, checks for various sums, amounting in all to the deficit in the plaintiff's cash as shown on his private memorandum. The plaintiff contended that the amounts transferred by Gray from one company to the other were so transferred for the purpose of paying his indebtedness to the company receiving them; but the auditor found that they were made for the purpose of concealing his deficit.

In the case of the Indian Orchard Mills, Gray charged a part of his thefts to certain persons, as if they had borrowed those sums, and kept an account of the remainder upon a memorandum like that kept with the plaintiff. These loan accounts, excepting Gray's, were fictitious. Gray held notes of these persons, and placed them in that part of the safe, common to the two mills, where the books and papers of the Indian Orchard Mills were kept. These notes did not represent value received from, nor any dealings with, the Indian Orchard Mills; but only Gray's defalcations.

On September 27, 1886, the Indian Orchard Mills brought an action, which is still pending, against one of these persons on

a note for $2,000 given to the order of Gray, who indorsed and deposited it in that part of the common safe where the papers of the Indian Orchard Mills were kept, and at the same time took a check of the defendant to his own order for $2,000, and appropriated the same to his own use, entering it as a loan to the maker of the note. The amounts supposed to be lent to such persons were entered in the general loan account on the ledger, and so into the monthly trial balances, and into the annual State returns; but the names of the supposed borrowers did not appear there, nor in the ledger, and were not known to the directors. All of these alleged loans, except a portion of that to one person, were entered on the cash-book and journal of the Indian Orchard Mills with the name of the alleged borrower, and were also carried into the "loan account" in the ledger, where, however, the individual names of the alleged borrowers did not appear, it not being the practice of the book-keepers to insert in that account the names of the borrowers. Large transfers to the loan account were thus made from time to time from Gray's private memoranda, as a mode of concealing his cash deficit.

A comparison of the ledger with the cash-book and journal would have disclosed these accounts. These alleged loans were entered on the books in the same way in which all loans were entered, no separate account being kept of such loans. All loans were credited to cash and charged to the loan account on the ledger. The accounts of the Indian Orchard Mills were made up and examined on the last Saturdays of April and October; and the deficiency of cash was made good by checks of the Atlantic Cotton Mills made to the order and deposited to the credit of the Indian Orchard Mills.

The net amount taken by Gray for his own use from the plaintiff was $265,786.95, and from the defendant, $267,535.62. The only question is, how the account between them should be made up.

When the frauds were exposed, on August 14, 1886, the transfers of cash from the defendant to the plaintiff by checks so made to conceal the truth were larger than from the plaintiff to the defendant by the sum of $219,114.48. This balance was, in a certain sense, accidental; depending on the fact that the frauds were discovered about six weeks after the Atlantic Cotton

Mills had made up its semiannual account, at which time their cash was made good from the defendant's treasury, and before Gray had gone far in preparing for the next settlement with the defendant by transferring to its credit checks of the plaintiff, having then transferred about $50,000. From the mode in which the transfers of cash were made, if each company was charged with the checks transferred to it from the other, the exact amount of money taken by Gray from each company would be lost by each; and this was the mode of accounting contended for by the defendant.

The plaintiff contended that the transfers of checks from one company to the other were, in fact and law, payments by Gray to an innocent creditor without notice, and therefore could not be reclaimed; that the losses must be borne as they stood at the time of the discovery of the frauds; or, which reaches the same result, that the loan accounts between the two companies as they appeared on their ledgers should be taken, the claims in set-off being disallowed.

The auditor ruled, as matter of law, that the account should be made up in the mode asked for by the defendant, and that, consequently, the defendant owed the plaintiff $146,385.52, and interest.

*J. G. Abbott & R. M. Morse, Jr.,* (*C. S. Hamlin* with them,) for the plaintiff.

*W. G. Russell & G. Putnam,* for the defendant.

C. ALLEN, J. The only question in this case is whether the defendant is entitled to be allowed, by way of set-off, for certain checks amounting to the sum of $219,114.48, which were fraudulently drawn by Gray on account of the defendant in favor of the plaintiff, as shown in the auditor's report, and transferred to and used for the benefit of the plaintiff.

There is no doubt that there has been an unauthorized transfer of property to this amount from the treasury of the defendant corporation to the treasury of the plaintiff corporation, without any consideration as between the two corporations. It was a fraudulent transfer by Gray, who was the treasurer of both corporations. If this were all there was to it, it would be quite plain that the plaintiff could not in good conscience retain the money. The doctrine is universal, and prevails alike at law and

in equity, that a person, though innocent, cannot avail himself of an advantage obtained by the fraud of another, unless there is some consideration moving from himself. It was long ago declared by Lord Mansfield, that, " although a third person shall not be punished for the fraud of another, he shall not avail himself of it. There is no case in the law where that can be done." *Robson* v. *Calze,* 1 Doug. 228. *Atlantic Bank* v. *Merchants' Bank,* 10 Gray, 532, 545. *Olmsted* v. *Hotailing,* 1 Hill, 317. *Udell* v. *Atherton,* 7 H. & N. 171. *Huguenin* v. *Baseley,* 14 Ves. 273. *Scholefield* v. *Templer,* 4 DeG. & J. 429. *Topham* v. *Duke of Portland,* 1 DeG. J. & S. 517, 569. *Russell* v. *Jackson,* 10 Hare, 204, 212.

The ground on which the plaintiff asserts a right to retain the money is, that Gray had embezzled its funds, as well as the funds of the defendant, to a large amount, and that it is entitled to apply the money thus received from him to reduce his indebtedness for such embezzlements, and treat the same as a payment *pro tanto;* that from the nature of the transaction, the law stamps it as a payment ; and that thus the plaintiff is a holder of the funds for a valuable consideration. There is no doubt that a thief may use stolen money, or stolen negotiable securities before their maturity, to pay his debts ; and in such case an innocent creditor may retain the payment. But this doctrine is inapplicable to the present case, for two reasons : in the first place, under the circumstances disclosed in the auditor's report, the plaintiff cannot be considered as an innocent creditor, that is, a creditor without notice ; and, moreover, the transaction did not amount to payment.

It is true, that no officer of the plaintiff besides Gray knew of the fraudulent origin of these checks ; but in the very transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. It is the same as if the plaintiff's directors had received the checks, knowing what he knew. For the purpose of accepting the checks, Gray stood in the place of the plaintiff, and was the plaintiff. It is quite immaterial, in reference to this question, in what manner or by what officers of the corporation the funds were afterwards used. The important consideration is, how the plaintiff became possessed of the money ; and it is apparent that it was through

the act of no other person than of Gray himself. It is not as if Gray had stolen the money, and then called the directors of the plaintiff corporation together and informed .them of his indebtedness and of his desire to make a payment on account, and had then paid over to them the money as money coming from himself, and they had received it without knowledge or suspicion that it had been stolen, and given him credit for it as part payment. There was no transaction whatever between Gray and the plaintiff, in respect to the transfer of this money, in which the plaintiff was represented either in whole or in part by any other person than by Gray; and therefore, even though the transfer to the plaintiff had been made in bank bills or in gold coin, (which it was not,) the plaintiff must be deemed to have had knowledge of the true ownership, because in receiving the funds it acted solely through Gray's agency. It must be deemed to have known what he knew; and it cannot retain the benefit of his act, without accepting the consequences of his knowledge. The plaintiff cannot obtain greater rights from his act than if it did the thing itself, knowing what he knew.

Such is the doctrine either expressly declared or necessarily involved in numerous adjudged cases. The leading case in this Commonwealth is *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, where there was the semblance of an accounting between the guilty agent and other officers of the bank which received the money, but it was held that there was no real accounting, and the general principle was held to be applicable. That case was followed by *Skinner* v. *Merchants' Bank*, 4 Allen, 290, where the facts were similar.

In *Loring* v. *Brodie*, 134 Mass. 453, 468, one of the numerous questions discussed arose upon the following alleged facts. Brodie as trustee held certain trust funds, and as an individual owed the Merchants' Bank. Fuller was cashier of the bank, and was also the agent of Brodie. As such agent, Fuller was in possession of certain moneys belonging to Brodie's trust funds, and wrongfully paid the same, in discharge of Brodie's private indebtedness to the bank, either to himself as cashier of the bank, or to the teller, who was under him. On a bill in equity by the *cestuis que trust*, it was declared by the court, that, if these facts were proved, the bank must restore the money thus

paid; that Fuller's knowledge was the knowledge of the bank; and that the bank could not receive the trust funds, except charged with the knowledge which the cashier had, and subject to the responsibilities which that involved.  But the court found that the proof was not sufficient to establish the facts as charged. And in another part of the same case, on page 458, a similar application of the same general doctrine was made, in holding the bank chargeable with Fuller's knowledge that certain securities pledged by Fuller as Brodie's agent to the bank, and received by Fuller as cashier, were trust funds.  The court say: " If Fuller was the instrument of Brodie in committing a fraud on the bank, by unlawfully transferring to it the securities of another, whether he concealed this fact or not, the bank could not take the securities from his hands, or hold them in its custody, except with the knowledge he had.  The only authority the bank could have to hold or sell them was under the contract made by or through Fuller, its cashier."  See also *United States v. State Bank,* 96 U. S. 30; *State Bank* v. *United States,* 114 U. S. 401, 409.

The effect of knowledge is to put the plaintiff in the same position that it would be in if there were no pretence of a consideration moving from it.  In order to entitle it to retain the defendant's funds, both elements must exist, — a good consideration, and the want of knowledge that the funds belonged to the defendant.  Such want of knowledge cannot in the view of the law exist, where the party in the particular transaction is represented solely by one who has knowledge.  The rule is general, that, if one who assumes to do an act which will be for the benefit of another, commits a fraud in so doing, and the person to whose benefit the fraud will enure seeks, after knowledge of the fraud, to avail himself of that act, and to retain the benefit of it, he must be held to adopt the whole act, fraud and all, and to be chargeable with the knowledge of it, so far at least as relates to his right to retain the benefit so secured. This rule is applied to preferences under insolvent or bankrupt laws, where fraudulent knowledge of the creditor's agent or attorney is imputed to the creditor, though he is personally innocent.  *Bush* v. *Moore,* 133 Mass. 198, 200.  *Rogers* v. *Palmer,* 102 U. S. 263.  And for numerous other illustrations of the

chargeability of a principal with his agent's knowledge, reference .may be made to the following cases: *National Security Bank* v. *Cushman,* 121 Mass. 490 ; *Suit* v. *Woodhall,* 113 Mass. 391; *Sartwell* v. *North,* 144 Mass. 188; *Moseley* v. *Hatch,* 108 Mass. 517; *The Distilled Spirits,* 11 Wall. 356 ; *Doggett* v. *Emerson,* 3 Story, 700, 735 ; *New Milford National Bank* v. *New Milford,* 36 Conn. 93 ; *Bank of United States* v. *Davis,* 2 Hill, 451, 464; *Bennett* v. *Judson,* 21 N. Y. 238; *Crans* v. *Hunter,* 28 N. Y. 389; *Glyn* v. *Baker,* 13 East, 509, 516 ; *Dresser* v. *Norwood,* 17 C. B. (N. S.) 466 ; *Boursot* v. *Savage,* L. R. 2 Eq. 134; *Rolland* v. *Hart,* L. R. 6 Ch. 678 ; *Espin* v. *Pemberton,* 3 DeG. & J. 547 ; *British & American Telegraph Co.* v. *Albion Bank,* L. R. 7 Ex. 119 ; *Bradley* v. *Riches,* 9 Ch. D. 189 ; *Blackburn* v. *Vigors,* 17 Q. B. D. 553, 559; *S. C.* on appeal, 12 App. Cas. 531, 537, 538.

We have preferred to put the decision of this point upon .the broad ground, that, if the treasurer of a corporation is a defaulter, and his defalcation is as yet unknown and unsuspected, and he steals money from a third person and places it with the funds of the corporation in order to conceal and make good his defalcation, and the corporation uses the money as its own, no other officer knowing any of the facts, the corporation does not thereby acquire a good title to the money, as against the true owner, but the latter may maintain an action against the corporation to recover back the same. But it is also apparent that in the present case the decision might rest upon a narrower ground. The fraudulent transfers were made by checks of the defendant, payable to the order of the plaintiff, and these checks before being available must necessarily have been indorsed by the plaintiff, acting by some officer authorized to indorse checks payable to its order. If these checks therefore were taken by the plaintiff in payment of indebtedness of Gray, they carried notice upon their face that they were checks of the defendant, not payable to Gray's order, but to the order of the plaintiff. Now, assuming that Gray's transaction had been conducted with some other officers of the plaintiff, who represented that corporation, it is impossible to suppose that they could have accepted these checks in extinguishment of a known indebtedness of Gray to the plaintiff, without being put upon inquiry as to how he came

by the defendant's checks to so large an amount, made payable to the plaintiff, which he could apply upon his private account. *National Bank of North America* v. *Bangs*, 106 Mass. 441, 445, 446.

Many authorities have been referred to on behalf of the plaintiff, which show that an agent's knowledge is not in all cases to be imputed to the principal. As a general thing, they fall within some clear line of distinction from the present case. The most recent of these cases is *Innerarity* v. *Merchants' Bank*, 139 Mass. 332, in which Burgess, the fraudulent agent, did not represent the bank in the particular transaction in question, but he was on one side of the transaction as representing himself, and other officers of the bank were on the other side as representing the bank. Under such circumstances, his knowledge of his fraud was not imputed to the bank. That case did not present the question whether a principal can avail himself of the results of his agent's fraud without responsibility for the fraud. So in *Dillaway* v. *Butler*, 135 Mass. 479, where the facts are not very fully set forth, it sufficiently appears that, in determining to accept the fraudulent mortgage in question, the plaintiff acted for himself, and innocently, and the supposed agent, who was privy to the fraud and who advised him to take the mortgage, was not at that stage of the transaction his agent, but was acting in his own interest, and for the mortgagor, and what he did was not for the benefit of the plaintiff, but a fraud upon him. He was not a general agent or solicitor for the plaintiff, but his agency for the plaintiff was limited to completing a transaction which the plaintiff himself had determined to enter upon. In *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, the dissenting opinion goes upon the ground that the examination of the funds in the teller's custody was in fact an accounting by him, in which he on the one side represented himself as an accounting officer, and the examining officers on the other side represented the bank. This view of the facts did not prevail with a majority of the court, but the principle relied on, even in the dissenting opinion, is entirely consistent with our present decision; while the view of the facts taken by the majority of the court brought that case substantially under the same rule applicable to the present case.

The case of *Ingraham* v. *Maine Bank*, 13 Mass. 208, is still much relied on, notwithstanding the explanation given in *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, 553, 556, of the ground upon which that decision must rest. In that case, the cashier of the Maine Bank drew official checks as cashier, got the money upon them, and placed the money with the funds of the bank, without entering it upon the books; thus the bank received the money raised upon its own checks, which it was bound to pay, and it might well be said that this money was its own under these circumstances. Nobody could claim it by any prior title, unless it were the banks upon which the checks were drawn; and they, instead of seeking to reclaim the money, relied upon and collected the checks which they held. The statement by the court, that "the transaction cannot be distinguished from an actual payment from his own funds to supply the defalcation," does not imply that the bank could in such case have held the money, as against the true owner, if he had stolen it from some one else, or that in such case the money would have been its own for all purposes. If such were the necessary implication from the language used, to that extent the doctrine stated could not be supported.

In the case of *In re European Bank*, L. R. 5 Ch. 358, the decision was placed on the ground that the claim of the Oriental Commercial Bank to the bills in controversy, as having been purchased with their money, was an equity attaching to the bills, and that the Eastern Commercial Bank, having purchased them when overdue, took them subject to this equity. The question respecting which Lord Justice Giffard, in delivering judgment, expressed his opinion, that, under the peculiar circumstances disclosed, the Eastern Bank was not affected with notice through Pappa, its sole director, was not material in the decision of the case, and his opinion, whether vindicable or not, is not an authority. The case *In re Marseilles Railway Co.* L. R. 7 Ch. 161, stands upon the same ground as *Innerarity* v. *Merchants' Bank, ubi supra.*

There is also a class of cases, which perhaps embraces the case of *In re European Bank, ubi supra*, where the act of the assumed agent is not for the benefit of his principal, but where, on the contrary, the agent forms a plan to cheat his principal,

and it is held that in that act he does not bear the character of agent, although his position as agent may enable him to carry out his plan. If an agent misuses funds of his principal which are in his hands, and devotes them to private purposes of his own, that is not an act of agency; so if he palms off poor securities of his own upon his absent principal, he conducting both sides of the transaction, it cannot be said in a proper sense that in such transaction he represents his principal. The principal is unrepresented. The agent cheats his principal. An embezzler does not represent his principal while in the act of stealing from him; although there is no one else to supervise the transfer of the property. Such cases are *Cave* v. *Cave,* 15 Ch. D. 639; *Kettlewell* v. *Watson,* 21 Ch. D. 685; *DeKay* v. *Hackensack Water Co.* 11 Stew. (N. J.) 158; *Davis Co.* v. *Davis Co.* 20 Fed. Rep. 699. They serve to illustrate the position of Gray towards the defendant in drawing the checks in controversy, but do not show that the plaintiff can retain the benefit of them without being chargeable with the knowledge which he possessed.

There is another class of cases where the same person has been trustee of two different funds, and has fraudulently transferred securities from one trust fund to the other. But in each case of this class which has been cited, there has been something in the nature of an accounting, and the trust fund which has received and has been held entitled to retain the benefit has been partly or wholly represented either by the *cestuis que trust,* or by an innocent trustee representing them. *Thorndike* v. *Hunt,* 3 DeG. & J. 563. *Taylor* v. *Blakelock,* 32 Ch. D. 560. *Case* v. *James,* 29 Beav. 512; *S. C.* on appeal, 3 DeG. F. & J. 256. In the last case, the final decision was put specially upon the ground that the surviving trustee himself, who was the sole plaintiff, and sought to follow the trust funds, had been guilty of a breach of trust in wrongfully consenting to a transfer, and that it did not appear that any *cestuis que trust* were interested in the proceeding, and that the trustee himself had no equity for his own benefit to follow the funds.

There is another class of cases, which have been cited for the plaintiff, which rest upon the ground that money, or negotiable securities, transferred to a third person, who receives them

innocently as property of the person from whom they come, for a valuable consideration, cannot be followed by the true owner; and the same rule extends to such property received by a firm from one of its members. *Lime Rock Bank* v. *Plimpton*, 17 Pick. 159. *Greenfield School District* v. *First National Bank*, 102 Mass. 174. *Thacher* v. *Pray*, 113 Mass. 291. *Ex parte Apsey*, 3 Bro. C. C. 265. *Jaques* v. *Marquand*, 6 Cowen, 497. *Dunlap* v. *Limes*, 49 Iowa, 177. These cases do not touch the principle upon which the present decision rests.

Thus far the discussion has proceeded upon the assumption, that even if the transfer of the defendant's property to the plaintiff were intended as a payment on account of Gray's indebtedness to the plaintiff, yet the plaintiff would not be entitled to hold the same, on the ground that it would be chargeable with Gray's knowledge of the source from which the money came. But it is equally clear, that the transfer cannot be considered as a payment by Gray to the plaintiff, because it was not so understood or intended by either party. There was no accounting between them. Nobody on the part of the plaintiff called Gray to any account, or knew that he was accounting, or that he was indebted to the plaintiff, or that these funds had come into the plaintiff's possession, or that they had come from Gray. Nobody knew any of these things except Gray himself. Nobody but Gray could possibly have intended that the transaction should amount to a payment, and his intention, if entertained, was ineffectual, because of his fraud. It is not necessary to deny or doubt that Gray might secretly transfer to the treasury of the corporation money or property of his own, and thus, if the same should be kept, extinguish an indebtedness arising from a former embezzlement. There would be nothing fraudulent in the act of such a transfer; and the corporation, being lawfully in possession of the money or property, might properly keep it. But where he undertook in this manner to make a payment by secretly transferring the property of a third person, the act cannot take effect as a payment, because it was not received as such by any person acting on behalf of the plaintiff. There was not even the semblance of an accounting. And under these circumstances, if the plaintiff would adopt the intention to make it a payment, it must also adopt the fraud. It

cannot adopt so much of Gray's act as was beneficial, and reject the rest.   As Lord Kenyon said, in *Smith* v. *Hodson*, 4 T. R. 211, it cannot blow hot and cold.   This ground also is fully covered by the decisions in *Atlantic Bank* v. *Merchants' Bank*, 10 Gray, 532, 547–553, and in *Skinner* v. *Merchants' Bank*, 4 Allen, 290.

It has been further suggested on the part of the plaintiff, that there was such a degree of negligence on the part of the defendant as ought to preclude it from maintaining its claim to the funds in controversy.   In respect to this, it is sufficient to say that we see no such negligence as ought to have the effect to deprive it of its property.

The fact that Gray, upon a private memorandum, charged himself with the sums fraudulently withdrawn by him is immaterial.   This act was unauthorized, and the defendant is not bound by it.   Entering it in this manner did not make the transaction a loan from the defendant to Gray.   It was none the less a fraudulent taking.   The substantial rights of the parties are not affected by the methods of book-keeping adopted by him to conceal his frauds, or by entries made upon private memoranda for the purpose of keeping an account of them. Nor can the plaintiff avoid liability for money which it received without consideration, by showing that Gray fraudulently entered the same upon the defendant's books as loans to other persons, and that the defendant has endeavored to collect the same from those persons.   The plaintiff was not misled, and gained no rights thereby.   *Commonwealth* v. *Reading Savings Bank*, 137 Mass. 431.   *Holden* v. *Hoyt*, 134 Mass. 181.

The result is, that judgment should be entered according to the report of the auditor.                               *So ordered.*