N. W. LEONARD, Appellant, v. W. A. LATIMER, Receiver of First National Bank, etc., Respondent.

Kansas City Court of Appeals, May 4 and June 15, 1896.

1. **Banks and Banking**: TRUSTS AND TRUSTEES: SCIENTER. Where the cashier of a bank in a given transaction alone represents the bank and a third party, whose agent he is, the bank is impressed with all the knowledge of the cashier as to the *mala fides* of the transaction.

2. **Equity**: FOLLOWING TRUST FUNDS: IDENTIFICATION. The old equity doctrine that there can be no recovery against the estate of a *mala fides* trustee unless the trust fund shall be definitely identified, has given place to the modern doctrine that, if the trust fund can be merely traced into the general estate of the defaulting trustee, such estate may be charged with the fund.

3. ——: ——: LACHES. In this case plaintiff has not been guilty of laches by failure to move promptly, since he was deceived by fraudulent practices.

*Appeal from the Pettis Circuit Court.*—HON. RICHARD FIELD, Judge.

REVERSED AND REMANDED *(with directions)*.

*J. T. Montgomery* for appellant.

(1) The direction given by Green to Thompson to pay over the proceeds of the $5,000 note which he had made to Marshall & Company, to the plaintiff and take up his note was an equitable assignment of that fund to the plaintiff which took effect and was in force *eo instanti* when plaintiff's note was canceled and his deed

of trust released, and not till then. 3 Pom. Eq. Jur. [2 Ed.], sec. 1280; *Johnson Co. v. Bryson*, 27 Mo. App. 341; *Williams v. Ingersoll*, 89 N. Y. 508; *Kimball v. Donald*, 20 Mo. 577. (2) The mere fact that J. C. Thompson, as cashier of his bank, designated the charge "Green Loan $4,925" on the books of the bank without drawing a draft on Marshall & Company, and attaching the note to it, and delivering note and draft to his bank, in consideration for the charge did not vest the bank with any right in or title to (either in equity or in law) the note or the proceeds thereof. *Bank v. Durfee*, 118 Mo. 431; *Vanstone v. Goodwin*, 42 Mo. App. 39; *Marshall v. Sturge*, 9 S. W. Rep. 250; *State v. Merritt*, 70 Mo. 275; *Wright v. McCormick*, 67 Mo. 426; *Stern v. Hurley*, 68 Mo. 262; *Springate v. Furniture Co.*, 51 Mo. App. 6. (3) If the cashier of the bank who is secretly a defaulter takes or uses the money of a third person without authority to make good and conceals his default, the bank does not thereby acquire a good title to the money, and the true owner can recover it. *Mills v. Mills*, 17 N. E. Rep. 502; *Bank v. Bank*, 10 Gray, 532; *Bank v. Town*, 36 Conn. 93; *Saving Inst. v. Boswick*, 191 N. Y. (Hun) 354; *Holden v. Bank*, 72 N. Y. 286; *Loring v. Brodie*, 134 Mass. 453; *U. S. v. Bank*, 96 U. S. 36; *Byne v. United States*, 93 U. S. 643; *Skinner v. Bank*, 4 Allen, 290. (4) Thompson's knowledge that the funds in controversy were a trust fund must be imputed to him as cashier of the First National Bank. The defendant admits in his answer that the bank knew that the fund was a trust fund. *Bank v. Town*, 36 Conn. 93; *Mills v. Mills*, 17 N. E. Rep. 502. (5) The following cases relied upon by respondent are not in point and have no application in this case. *Johnson v. Shortridge*, 93 Mo. 227; *Bank v. Lovitt*, 114 Mo. 519; *Benton v. Bank*, 122 Mo. 339; *Ihl v. Bank*, 26 Mo. App. 129; *Eyerman v.*

*Bank*, 13 Mo. App. 289. (6) The plaintiff's claim should be allowed as a preferred claim. The relation between the plaintiff and the bank was that of trustee and *cestui que* trust and not debtor and creditor. Where a trustee mixes trust money with his own so that it can not be distinguished what particular part is trust money, and what part is private money, equity will follow the money by taking out the amount due the *cestui que* trust. *Harrison v. Smith*, 83 Mo. 210; *Snodgrass v. Moss*, 30 Mo. 283. The bank, having received the benefit of the unlawful conversion, is chargeable with the amount of the converted fund, as a preferred claim; while it may be impossible to follow this fund into its diverted use, it is possible to make it a charge upon the estate or assets of the bank to the increase or benefit of which it has been appropriated. *Stroller v. Coates*, 88 Mo. 514; *Road Cart Co. v. Stevens*, 32 Mo. App. 346; *Newark on Deposits*, sec. 82; *Peak v. Elliott*, 30 Kan. 156; s. c., 1 Pac. Rep. 499; *Bank v. Ins. Co.*, 104 U. S. 54; *Independent District of Boyer v. King*, 45 N. W. Rep. 908; *People v. Bank*, 96 N. Y. 36.

*William S. Shirk* for respondent.

(1) The mere fact that Thompson was the cashier of the First National Bank during the time he was collecting the plaintiff's money, and negotiating the Green–Marshall loan, does not charge the bank with any notice or knowledge that Thompson may have had. He was not acting as cashier, or in any way representing the bank. *Ihl v. Bank*, 26 Mo. App. 129; *Eyerman v. Bank*, 13 Mo. App. 289; *Bank v. Lovitt*, 114 Mo. 519; *Benton v. Bank*, 122 Mo. 339; *Johnson v. Shortridge*, 93 Mo. 227; *Bank v. Froman*, 31 S. W. Rep. 769; *Bank v. Christopher*, 30 N. J. L. 435; *Bank v. Babbidge*, 36 N. E. Rep. 462. (2) It is so familiar a principle, that

p ayment to the agent is payment to the principal, that it needs no citation of authorities. (3) Plaintiff's claim is stale. The money was obtained on the Marshall loan in December, 1891. From that time until May 4, 1894, when the bank failed, a period of two years and five months, he took no steps toward getting his money, nor did he make any investigation, whatever. After the bank had failed, and Thompson had fled the country, insolvent, he for the first time claims that the bank is liable to him for his money. *Kroenung v. Goehri*, 112 Mo. 641; *Sanderson v. Voelker*, 51 Mo. App. 328, and see, generally, Beach, Mod. Eq. Prac., sec. 258, note 2. (4) Nor is there a word of evidence that this money was taken by Thompson to cover up any default—nor was it paid into the bank for such purpose. If it had been, there might be some cause to allege that it came within the cases of *Atlantic Mills v. Indian Mills*, 17 N. E. Rep. 502, and *Bank v. Bank*, 10 Gray, 532. To the contrary, the money was placed to Thompson's individual credit, and checked out by him, as by any other individual. (5) To constitute a preferred claim against the assets of the First National Bank, in the hands of the defendant receiver, the evidence must show: That the money was a trust fund in the hands of Thompson. That the bank must have received it, knowing it to be such trust fund, and the plaintiff must be able to trace his money into the hands of the receiver, or into some specific property, which has come into the hands of the receiver. There is no evidence of either one of these facts. *Phillips v. Overfield*, 100 Mo. 466; *Naulucket Co. v. Flanders*, 58 N. W. Rep. 383 (overruling all prior Wisconsin cases); *Freburg v. Stoddard*, 28 Atl. Rep. 1111; *In re Gavin v. Gleason*, 105 N. Y. 256; *Bank v. Dowd*, 38 Fed. Rep. 172; *Bank v. Armstrong*, 148 U. S. 50. In the case of

*Harrison v. Smith*, 83 Mo. 210, it is assumed all the way through the case, that sufficient funds came into the hands of the receiver, to which the trust fund could be traced.

GILL, J.—This is a suit in equity to charge the estate of the First National Bank of Sedalia with the sum of $2,275 as a preferred claim. The judgment below was in defendant's favor and plaintiff appealed.

The material facts disclosed in the record are about as follows: In the year 1885, plaintiff Leonard, a resident of Howard county, Missouri, loaned, through J. C. Thompson, cashier of the Sedalia bank, to one Green, of Pettis county, the sum of $5,000, taking as security a deed of trust on a section of land. The loan was continued over past due, Green paying the interest, until August, 1891, when Thompson reported to Green that Leonard wanted his money, and at the same time advised Green that he, Thompson, could place the loan with some eastern parties, Marshall & Company, of West Chester, Pennsylvania, and at a lower rate of interest. Thereupon Green made a new note for $5,000, payable to Marshall & Company, and along with it a deed of trust, dated August 1, 1891, and gave the paper over to Thompson with instructions to get the money from Marshall & Company and pay off the Leonard loan. Thompson took the papers for the Marshall loan, and without the knowledge or consent of either Green or Leonard, placed the same with his own private papers, where they remained until February, 1892, when he, Thompson, wrote to Leonard that Green had then arranged for a new loan, and requested Leonard to assign and return his note to him, Thompson, so that he could have the record satisfied; that he, Thompson, would then collect and remit the money. Leonard did as Thompson suggested, assigned the

Green note, and sent the papers to Thompson, expecting soon to receive in return his money. Thompson then took the Leonard note, went to the recorder's office, presented the same (marked paid and canceled) to the recorder, and had the record of the Leonard deed of trust satisfied. Thompson then forwarded to Marshall & Company, West Chester, Pennsylvania, the note and deed of trust belonging to the new loan, advising them that the proceeds of the loan were to go to the payment of the Leonard claim, and further directing Marshall & Company to place the money with the American Exchange National Bank of New York, to the credit of the First National Bank of Sedalia. Marshall & Company obeyed these instructions only so far as to deposit $2,275 in the American Exchange Bank, to the credit of Thompson's bank, retaining the difference between that sum and the amount due on the $5,000 loan, on account of a balance Thompson was then indebted to Marshall & Company on some prior deals. It is this $2,275 thus turned into and commingled with the assets of the First National Bank of Sedalia, that is now claimed by the plaintiff and which he contends was wrongfully converted, and which ought to be charged as a trust fund against the assets of the bank.

It is further proper to state that Leonard was not advised of the payment of his claim against Green until some time afterward, when the Sedalia bank was closed and Thompson had fled the country, charged with various crimes and delinquencies, in connection with the affairs of the institution he had long conducted. Leonard wrote Thompson asking what had been done in the matter, and Thompson misled him by stating that Green had failed to secure the eastern loan as expected, but that he would shortly; and when at last Leonard asked for the return of the Green note and

deed of trust, Thompson informed him that in doing some repairs about the bank, the note had been mislaid, and that if he didn't find it soon he would get Green to execute a substitute for the lost paper.

The entire history of the transaction will not be complete without a further statement as to how Thompson used the name of "Green loan" to bolster up his accounts in the bank. From what has already been stated, it will be seen that from August 1, 1891 (when Green gave over to Thompson the papers for the new loan) to the latter part of February, 1892, Thompson held the papers and failed to conclude the arrangement for transferring the loan from Leonard to Marshall & Company. He kept Leonard in the dark by the misrepresentations already noticed, and, in addition, sent to Leonard the interest, as if paid by Green, and deceived Marshall & Company by telling them that Green was trying to effect a sale of his property and thereby pay off the Leonard loan. Green, in the meantime, thought the transaction was long since closed.

While Thompson thus held the papers for the Marshall–Green loan, he seems to have been largely in arrears with the bank of which he had charge. So, in December, 1891, in order to enlarge the credit side of his individual account—or, rather, to reduce the debtor column—he debited the "sundry bank" account with $4,925 (which was the amount of the Green loan, less $75 commission) and credited his individual account with a like sum. And this was carried in this shape until after the loan was fully consummated the following year.

I.  As we view this controversy, the controlling facts are few and practically undisputed. Leonard sent to Thompson the Green note, with instructions to collect and remit. Thompson made the collection, but fraudulently concealed the matter from Leonard; then

applied the larger part thereof toward the payment of his individual debt to Marshall & Company, and turned over the balance of $2,275 to the bank, of which he was cashier and manager. That this conduct amounted to an unlawful conversion by Thompson of plaintiff's money can not be questioned. That Thompson wrongfully misapplied the entire amount and was properly chargeable as the holder of a trust fund, which under the law may be reclaimed by the plaintiff, either from Thompson or those receiving it from him with full knowledge of the trust—is equally clear. This is a suit against a recipient of $2,275 of that money. If the bank is chargeable with notice of the trust character of the part it received, then clearly it occupies no better position than would Thompson, and plaintiff ought to recover, *provided*, of course, he is proceeding against assets which can be subjected to the charge.

The question, then, is whether or not Thompson's knowledge in the transaction is to be imputed to the Sedalia bank. We think it must. It is a rule of law that notice to the agent, while prosecuting the business intrusted to him, is notice to the principal. The testimony shows that not only was Thompson cashier of the Sedalia bank, with all the authority which that position implies, but he had and exercised, at the time and for years prior thereto, complete and entire management and control of its business, unhampered and free of any dictation or instruction from other officers. For the purposes of its business he stood in place of and personated the bank. As the plaintiff's agent, then, Thompson collected this money; and as the sole and only acting representative of the bank, he received and misappropriated the same—diverted it from its legitimate owner and wrongfully added it to the assets of his bank. In handling plaintiff's money, he occu-

pied a dual relation; and in the performance thereof wronged the plaintiff to advantage his bank and himself.

In view, then, of the relation which Thompson bore to the bank, when the latter received the $2,275, it must be deemed as having knowledge of the trust character of the fund and to have become a party to its wrongful conversion. The rule declared in *Bank v. Lovitt*, 114 Mo. 519, to the effect that, "when an officer of a corporation is dealing with it in his individual interest, the corporation is not chargeable with his uncommunicated knowledge of facts derogatory to his title to the property which is the subject of the transaction," can not be used here to protect the bank as an innocent holder of the diverted trust fund in question. As said in *Steam Stone Cutter Co. v. Myers*, 64 Mo. App. 527, that principle has usually, if not always, found its application when one officer of the corporation shall have notice and then deal with other officers who are innocent. And it is held in such cases that he does not, in the particular transaction, represent the corporation, but himself alone; the knowledge he has, under such circumstances, he is under no obligation to disclose, and hence notice will not be imputed to the corporation principal. But the facts of the case at bar take it out of that line of decisions. Here Thompson was the sole representative of the bank; he had the exclusive management of its affairs; he, as agent for Leonard, and holding in trust the latter's money, turned it over to the bank on whose account he, as its agent, received and misapplied it.

Under these circumstances we think it clear that the Sedalia bank was at the time chargeable with knowledge of Thompson's fraud, and that it took plaintiff's money with full notice of the trust impressed thereon. We cite a few of the leading authorities sus-

taining this conclusion. *Bank v. Town of Milford*, 36 Conn. 93; *Atlantic Mills v. Indian Orchard Mills*, 147 Mass. 268; *Holden v. Bank*, 72 N. Y. 286; *Bank v. Babbidge*, 36 N. E. Rep. 462; *Smith v. Farrell* 66 Mo. App. 8; *Steam Stone Cutter Co. v. Myers*, 64 Mo. App. 527.

The case of *Atlantic Mills v. Indian Orchard Mills*, above cited, is full of valuable suggestions and citations bearing on this case. Gray was the common treasurer of two corporations, and in order to make good his deficit to one, he drew checks upon the other, payable to the order of the first, by which the money was drawn and used, no other officer of either knowing the facts. He charged himself upon a private memorandum with a part of the money, and falsely entered the remainder upon the books of the corporation upon which the checks were drawn, as loans to a third person, which loans were, in fact, never made and were entirely fictitious. It was there held that the corporation using the money was affected with Gray's knowledge, and that the transaction did not amount to a payment of the deficit. In the opinion, the court says: "It is true that no officer of the plaintiff besides Gray knew of the fraudulent origin of these checks; but in every transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. It is the same as if the plaintiff's directors had received the checks, knowing what he knew. For the purpose of accepting the checks, Gray stood in the place of the plaintiff, and was the plaintiff. It is quite immaterial in reference to this question, in what manner and by what officers of the corporation the funds were afterward used. * * * The effect of knowledge is to put the plaintiff in the same position that it would be in if there were no pretense of a consideration moving from it. In order to

entitle it to retain the defendant's funds, both elements must exist—a good consideration, and the want of knowledge that the funds belonged to the defendant. Such want of knowledge can not, in the view of the law, exist where the party in the particular transaction is represented solely by one who has knowledge."

II.    The case thus far made is that plaintiff's money in Thompson's hands was a trust fund, and that the Sedalia bank received it with knowledge that it was such trust fund and wrongfully mixed it with its own assets.    The remaining question is, can plaintiff follow the money and charge the general assets of the bank as a preferred claim.

As to how far it is proper to go in following a trust fund—that is, what degree of identity should be established by the party seeking to reclaim his property—the authorities are not at all in harmony.    According to one class of decisions, the old equity rule is adhered to, that is, that there can be no recovery unless the trust fund shall be definitely identified, or clearly traced into some specific property; while, according to what is termed the doctrine of modern equity, it has been held sufficient if the trust fund can be merely traced into the general estate of the defaulting trustee.

It will serve no useful purpose to go over and discuss these opposing authorities, since our supreme court has clearly aligned itself with the modern equity rule. *Harrison v. Smith*, 83 Mo. 210; *Stoller v. Coates*, 88 Mo. 514.

In the first case, after discussing various authorities, it was said, that "where the trust money of plaintiff was mingled wrongfully, if not fraudulently, with funds of the bank, and went into its business operations, a very short time previous to the assignment of its effects, and while not clearly traceable to any particular asset of the bank, the fact remains that it went

into its assets, and to the extent of $4,500, increased and swelled the volume of its assets, and it logically follows from such application of the principle that plaintiff was entitled to the relief prayed," etc. And again, in *Stoller v. Coates, supra,* this language was used (italics ours): "The defendant claims that the plaintiffs can not follow the fund after it was thus mingled with the other assets of the bank, so as to be distinguishable from them. The authorities cited by defendant would seem to support this position. But in the recent case of *Harrison v. Smith,* 83 Mo. 210, the doctrine contended for has undergone a material modification. While it may be impossible to follow the fund in its diverted uses, it *is always possible to make it a charge upon the estate, or assets,* to the increase or benefit of which it has been appropriated. *The general assets of the bank having received the benefit of the unlawful conversion, there is nothing inequitable in charging them with the amount of the converted fund,* as a preferred demand."

This feature of the present case is settled by the foregoing decisions, contrary to defendant's contention. Nor is their authoritative force at all impaired by *Phillips v. Overfield,* 100 Mo. 466. The cases are not analogous, and besides the court there refers with approval to *Harrison v. Smith.*

There is no merit in the claim that plaintiff lost his rights by failure to move promptly against the bank, for the wrongful conversion of his money. Plaintiff was deceived by the fraudulent practices of Thompson, and the delay in bringing suit was clearly caused thereby.

The judgment will be reversed and the cause remanded, with directions to enter judgment for the plaintiff as prayed. All concur.