MAYS et al. v. FIRST STATE BANK OF KELLER. (No. 9404.)

(Court of Civil Appeals of Texas. Fort Worth. May 28, 1921. Rehearing Denied July 2, 1921.)

1. Principal and agent ⟐177(1)—Notice to agent is notice to principal.

The principal is bound by the knowledge of the agent, that is, notice to the agent constitutes notice to the principal.

2. Banks and banking ⟐116(6)—Notice to cashier acting for self in taking notes not imputable to bank.

Where the cashier of a bank in taking title to certain notes was furthering his own interest and object and was not acting for the bank, it cannot be presumed that he would have notified the controlling officers of the bank of his own violation of the trust imposed in him by the parties transferring the notes, so that notice to him is not notice to the bank.

3. Bills and notes ⟐359—Bank which took notes in satisfaction of pre-existing indebtedness gave "value" and was holder in due course.

Bank which took notes in liquidation of its cashier's pre-existing indebtedness to the bank held a holder in due course, having given "value" within Vernon's Sayles' Ann. Civ. St. 1914, art. 582.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series; Value.]

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Suit by the First State Bank of Keller against W. J. Mays and others. From judgment for plaintiff, defendants appeal. Affirmed.

John L. Poulter, of Fort Worth, for appellants.

Samuels & Brown, of Fort Worth, for appellee.

CONNER, C. J. In its final form this suit is one by the appellee, First State Bank of Keller, against W. J. Mays and Charles Mays upon two series of promissory notes. The first series consisted of six, payable in the sum of $100 to W. J. Mays, or order, and given by Riley and Sarah Gonzales, as purchase money for a certain tract of land conveyed by W. J. Mays to them.

These notes were dated August 3, 1914, and the first one made to mature July 7, 1915, and the others yearly thereafter. The second series consisted of two, each payable to W. J. Mays, or order, in the sum of $550, and executed by one J. W. Price as part of the purchase money of certain lots owned by W. J. Mays and conveyed to Price on the date of the notes, which was October 26, 1914. These notes matured July 1 and December 1, 1915, respectively.

Gonzales and wife and J. W. Price were made parties defendants and the plaintiffs sought, as against them and W. J. Mays, judgment with a foreclosure of the vendor's liens evidenced by the notes. The claim of Charles Mays originated after the claim of the plaintiff bank, and is wholly dependent upon the defense presented by the defendant W. J. Mays, and in our subsequent treatment of the case we will therefore make no further reference to Charles Mays.

There is but little, if any, controversy in the facts. Briefly stated, in September and October, 1914, the cashier of the plaintiff bank, one John Thomson Adams, appropriated certain moneys to his own use and thereby became indebted to the plaintiff bank in the sum of $1,700. This defalcation having been discovered, the said cashier, on the 27th day of October, 1914, brought to and had entered upon the bank's books the promissory notes hereinabove described, in liquidation of his said indebtedness. The evidence shows that the bank officers and others, from time to time, passed upon and treated said notes as the property of the bank and as an extinguishment of the cashier's indebtedness, and the jury, in answer to a special verdict, so found. It is also undisputed that at the time of such deposit each of said notes was indorsed by W. J. Mays. It is also undisputed that at the time of such deposit of the notes and acceptance thereof by the plaintiff bank no officer other than said cashier had notice or knowledge of any defense to said notes, or of a vice or imperfection therein.

It further appears, however, both from the evidence, and from a special finding of the jury, that at the time of the delivery of the notes in question by J. Thomson Adams it was understood and agreed between them that said notes should be put up as collateral by the said Adams only to obtain a loan from R. G. Johnson, and that said notes should be used in no other way and for no other purpose; the testimony on the subject by W. J. Mays being to the effect that Adams, in whom he had confidence, approached him with the representation that he was about to lose a section of land in West Texas that he had purchased, for the want of $1,700, and that to enable Adams to save his land he (Mays) had given the notes in question to him (Adams) with the direction to take them to Mr. R. G. Johnson and use them as collateral security for a loan.

Upon the evidence and findings referred to, the court entered judgment in favor of the plaintiff bank against the makers and W. J. Mays, as indorser, for the amount due on the said notes, also foreclosing the vendor's liens as prayed for, and the defendant W. J. Mays has appealed.

Appellants first assign error to the refusal of the court to instruct the jury to find for the defendants, and thus state their theory of the case:

"We took the legal position in the court below and will endeavor to present the case in this court upon the theory that, when W. J. Mays sold the land belonging to him and took the notes in controversy as a part of the purchase price for his land, the notes were then his property, and that he had the legal right to enter into an agreement with Adams that the notes should be hypothecated to secure a loan of money to be paid on a section of land, so that the land would be available as an asset and available as a means of releasing the notes, so that they could be returned to their rightful owner, without losing his ownership of his said property, while in the hands of Adams, who undertook to violate his trust and misappropriate them, or in the hands of any one who wrongfully acquired them or took them with notice of the arrangement under which they were acquired from the owner. If the notes were acquired from W. J. Mays without consideration and for a specific purpose, which trust and agreement was violated by Adams, the duly elected cashier of the Keller State Bank, the bank could not then set up a superior title to the notes as against W. J. Mays, by acquiring the possession of the notes through the false and fraudulent acts and conduct of their duly elected agent and cashier, Adams, without assuming the knowledge possessed by its cashier of the means used in acquiring the notes from Mr. Mays. Mays parted with his possession of the notes without consideration. This is undisputed. The bank could not legally claim a superior title to the notes unless it could occupy the position of an innocent purchaser in due course of trade, for value, without notice of the circumstances under which they were acquired from Mays. This, we insist, the bank has not done under the record of this case."

[1] While it is a well-settled general rule of law that the principal is bound by the knowledge of an agent, or, otherwise stated, that notice to the agent constitutes notice to the principal, yet there are exceptions to the rule. The general rule is based upon the duty resting upon the agent to disclose to his principal all the material facts coming to his knowledge with reference to his agency, and a presumption that he has done this is ordinarily indulged. But it seems apparent to us, as it evidently did to the lower court, that the cashier of the plaintiff bank in acquiring the notes in question from W. J. Mays was not acting for the

bank. It does not appear that the bank was engaged in the general business of purchasing securities of the kind, nor that the cashier had been commissioned by the bank to secure either the notes in question or any other notes, unless, perhaps, notes given for moneys loaned out of the bank. On the contrary, it seems quite evident that in securing the notes as he did from W. J. Mays the cashier was acting in his own interest and to serve a particular purpose of his own, to wit, to therewith discharge his liability to the bank arising out of his misappropriation.

The author of Ruling Case Law (volume 21, p. 843, § 24) thus states the rule that we think should be applied here:

"While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating."

[2] Adams' authority as cashier was sufficient, doubtless, to pass title to the notes secured by him from W. J. Mays to the bank, by having them entered upon the bank's books as the bank's property and procuring the acceptance of the same, but in so doing he was furthering his own interest and object, and it cannot be presumed that he would have notified the controlling officers of the bank of his violation of the trust imposed in him by W. J. Mays. To have done so would, doubtless have defeated the very purpose he had in view.

In 31 Cyc. pp. 1269 to 1270, it is said:

"A principal also has a right to receive money from an agent in payment of a debt due from the latter without inquiry as to the source from which it came; and if it is in good faith so received and applied by the principal, its subsequent retention after he learns that it was procured through an unauthorized transaction entered into by the agent in his name will not amount to a ratification of such transaction."

See, also, Kauffman v. Robey, 60 Tex. 308, 48 Am. Rep. 264; Texas Loan Agency v. Taylor, 88 Tex. 47, 29 S. W. 1057; Holmes v. Uvalde Nat. Bank, 222 S. W. 640, and cases therein cited.

We think, therefore, that we must hold that the appellee bank is not affected by the vice, if any, occasioned by the cashier's (Adams') use of the notes otherwise than as authorized by W. J. Mays.

[3] We are of the opinion also that it must be held that the plaintiff bank is a holder of the notes in question in due course and for a valuable consideration.

In 2 Williston on Contracts, p. 2140, it is said:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Every element necessary to establish the appellee bank as a holder of the notes in question "in due course," as defined in the quotation, has been established in the case before us by the undisputed evidence, unless it can be said that the bank did not pay value therefor. Article 582, V. S. Tex. Civ. Statutes, provides that an assignee of negotiable instruments may sue in his own name, and if he obtains such instrument before its maturity, "by giving for it a valuable consideration, and without notice of any discount or defense against it, then he shall be compelled to allow only the just discounts against himself."

In Williston on Contracts, p. 2125, § 25, the author, in speaking of what "value" must be given by the transferee of negotiable instruments in order to constitute him "a purchaser for value or holder in due course," says:

"Value is any consideration sufficient to support a simple contract: An antecedent or pre-existing debt constitutes value; and is deemed such whether the instrument is payable on demand or at a future time."

Chief Justice Hemphill, in Greneaux v. Wheeler, 6 Tex. 515–527, has this to say on the subject:

"The rule that to support the holder's title, the transfer must be bona fide and for valuable consideration, was usually expressed, in the earliest cases, with the qualification that the notes must have been received in the usual course of trade. What is meant by the usual course of trade has been much discussed, and attempts have been made to limit the description to cases in which the holder has made an actual advance in money, or its equivalent, for the paper. In New York, it has been held that a note taken in payment of a precedent debt was not taken in the usual course of trade; and the holder would not have a valid title as against the real owner; nor could he resist an equitable defense, good between the maker and the payee. But the great weight of authority is that a transfer for a precedent debt is in the usual course of trade; and the holder must be treated as a bona fide holder for value. Judge Story, in the case of Swift v. Tyson (16 Pet. R. 1), reviews the New York cases and the whole doctrine. In his luminous opinion, he states that, assuming it to be true (which, however, may well admit of some doubt, from the generality of the language)

that the holder of a negotiable note is unaffected by the equities of the antecedent parties, of which he has no notice, only where he receives it in the usual course of trade and business, for a valuable consideration before it becomes due, we are prepared to say that receiving it in payment of, or as security for, a pre-existing debt, is according to the known usual course of trade and business."

In 3 Ruling Case Law, p. 269, § 269, in discussing the subject, it is said:

"The prevailing view, however, has been that the indorsee of a bill of exchange or a promissory note, before its maturity, taking it as payment or security for a pre-existing debt, is to be deemed a holder for a valuable consideration, in the ordinary course of trade, and to hold it free from the latent defenses on the part of the maker."

In Herman v. Gunter, 83 Tex. 66, 18 S. W. 428, 29 Am. St. Rep. 632, it was said that one who acquired a negotiable note in payment of a pre-existing debt is a purchaser for value and in the usual course of trade. See, also, Alexander v. Bank, 19 Tex. Civ. App. 620, 47 S. W. 840, where it was held that the holder of a negotiable note acquired before maturity as collateral security for a pre-existing debt would be protected as an innocent holder, unless he had notice when he acquired it of the equity existing between the maker and the payee.

What we have said, we think, disposes of every material question presented by the assignment of error. They are all accordingly overruled, and the judgment is affirmed.

### On Rehearing.

We think this case distinguishable from that of Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698, and that the case of Hummel v. Bank, 75 Iowa, 689, 37 N. W. 954, cited in footnote to first case, more nearly applicable to the case before us.