[No. 25133. Department One. April 11, 1935.]

CALVARY CEMETERY, *Respondent,* v. HARRY BELL, *Appellant.*[1]

[1] Reported in 43 P. (2d) 25.

456

*Lloyd & McGavick*, for appellant.

*Burkey & Burkey* and *S. J. O'Brien*, for respondent.

GERAGHTY, J.—In this action, a decree is sought adjudging the plaintiff to be the owner of a promissory note and mortgage in the possession of the defendant and requiring him to return them to the plaintiff. Decree as prayed for was entered in favor of plaintiff, and the defendant appeals.

The respondent, who will hereafter be referred to as the cemetery, is a duly incorporated cemetery association, organized in 1905 to establish and maintain a cemetery at the city of Tacoma. At the time of the occurrences giving rise to this litigation, H. J. Schwinn was secretary of the cemetery, a position he had held continuously for approximately twenty years. Schwinn was also the principal stockholder and president of H. J. Schwinn & Company, a corporation, which will be referred to as the corporation. The corporation was dominated by him and may be said to have been his other self. It was engaged in the real estate, mortgage loan and insurance business. While Schwinn was nominally only secretary of the cemetery, he was, in fact, if not in name, its manager and conducted all its business affairs. He appears to have enjoyed the confidence of the trustees and other officers of the cemetery. The trustees met only at infrequent intervals, and no election of members of the board had been held for a period of over ten years.

The corporation attended to the sale of burial lots for the cemetery, lent its money, and collected its interest. It was necessary for Schwinn to consult Mr. James F. O'Brien, president of the cemetery, when his signature was required, but O'Brien generally executed without question the corporate papers submitted to him by the secretary. While Schwinn was secre-

tary and paid a salary of two hundred dollars a month by the cemetery, his corporation really functioned for him, and he testified that his monthly salary from the cemetery was turned over to the corporation to help defray its expenses.

Appellant was a client of the corporation, which had made many loans for him upon real estate mortgages. A brother of appellant, Charles Bell, was an employee of the corporation; for many years he had been its bookkeeper, but latterly he was in charge of its insurance department, although the bookkeeper always consulted him for advice as to the proper entry of transactions upon the corporation and cemetery books. He lived with the appellant and gave more than routine attention to the brother's dealings with the corporation.

In November, 1931, the corporation had on hand one thousand dollars collected for appellant. In December, he placed with the corporation another thousand dollars, and on June 3, 1932, another thousand dollars. These sums were left with the corporation for investment in first mortgage loans. The corporation did not lend the money, but instead, deposited it in the bank to its general credit and used it for its own purposes. Three notes for one thousand dollars each were executed by the corporation and placed by Charles Bell in a box kept by appellant in the corporation's safe. It does not appear that any of appellant's money was paid to the cemetery or spent on its account, and during the period involved, the corporation's receipts from cemetery accounts were more than the sum advanced to the cemetery.

In 1931, the corporation was insolvent, a fact known to Schwinn and Charles Bell. Their knowledge of the financial condition of the corporation is clearly proven by the record, notwithstanding the evasive and indefi-

nite character of their testimony. At this time, the corporation owed the cemetery upwards of six or seven thousand dollars on account of funds it had misappropriated. It was heavily indebted to its bank and had misappropriated the funds of other clients. When a receiver was appointed in April, 1933, it was disclosed that its liabilities were approximately thirty-five thousand dollars, with assets of the value of not much over two thousand dollars.

Charles Bell, apparently worried about the condition of his brother's account, had been urging Schwinn to secure the brother by procuring a proper loan. In checking over the cemetery loans kept in the office of the corporation, he found one note made by J. P. Ruddy and wife in the sum of three thousand dollars, secured by mortgage. This was of the precise amount required to cover the corporation's shortage to his brother. Whether Schwinn or Charles Bell first suggested the assigning of the Ruddy loan to appellant is not wholly clear from the evidence, because there developed at the trial a striking lapse of memory on the part of all concerned with the transactions of the corporation and the cemetery. Bell, while admitting he urged the securing of a loan for his brother, said the suggestion of the use of the Ruddy loan came from Schwinn. Schwinn, on the other hand, testified that Bell made the suggestion, and that he, Schwinn, first objected but later agreed if the assent of Mr. O'Brien, president of respondent cemetery, could be obtained.

Bell testified he broached the matter to O'Brien and explained to him fully that it was proposed to assign the note and mortgage to appellant in exchange for the three notes of the corporation, and that he also told O'Brien, in answer to his inquiry, that the corporation had overdrawn its account with the cemetery some five thousand dollars or more; that O'Brien assented

to the assignment and told him to have one prepared and sent over. The assignment was brought to O'Brien by Helen Burke, the bookkeeper, and was signed by him. O'Brien testified that his recollection of the transaction was not clear on account of a recent illness, but that he was sure Bell did not tell him the circumstances, and that he signed assuming the mortgage was being sold for cash in due course. He admitted he did not pay close attention to the cemetery's affairs, but, like everyone else connected with it, trusted Schwinn.

After its execution by O'Brien as president, the assignment, which bears date June 27, 1932, was returned to Schwinn's office and signed by him as secretary. The Ruddy note was then placed in appellant's box by Charles Bell, and the corporation's notes to appellant were turned over by Bell to Schwinn. These notes were marked paid by Bell and initialed "H. C. B. by C. B." on July 1st, and the cemetery was credited on the books of the corporation with three thousand dollars. The mortgage was recorded and later placed in appellant's box with the note.

The appellant testified he had left his money with the corporation for first mortgage loans; that he had theretofore done considerable business with the company; that he did not lend the money to the corporation, and did not know of the corporation's notes in the first instance or of their transfer to the cemetery, and did not know that the mortgage and note had been assigned to him and put in his box. His brother had access to the box and could deposit or remove papers therefrom as occasion required. It may be noted, in passing, that the notes were not assigned in form to the cemetery by appellant's endorsement.

As we read the record, it bears this construction: The appellant had entrusted to the corporation three thousand dollars to be lent upon first mortgage

security. This was not done, but instead, the corporation misappropriated the funds to its own use, placing in appellant's box, without his actual knowledge, its own unsecured notes. It thereafter misappropriated and transferred to appellant the note and mortgage of another client—the cemetery—in breach of its duty and without consideration, to cover up its defalcation. No consideration passed from the appellant to the respondent for the assignment. His money had already been misappropriated by the corporation.

It appears from the record that much latitude was allowed to Schwinn, the secretary, in making loans of the cemetery's funds. There was some testimony by O'Brien and some of the trustees to the effect that there was an understanding that the funds were to be lent only on first mortgages. There was no written minute to this effect, however. There is a resolution in the minutes, adopted many years before the transactions here involved, authorizing the making of good loans. But whatever the extent of Schwinn's authority, or that of his company, it was not broad enough to authorize the transfer of the mortgage without consideration, or in payment of their own debt.

While not making formal findings of fact, the trial court found in its memorandum opinion that the assignment was made, first, without consideration; secondly, through the conspiracy of Charles Bell and Schwinn; and thirdly, without authority in the president and secretary of the respondent. These findings are fully supported by the record. The trial court, while finding appellant free of any participation in the initial fraud, held him accountable for the acts of Schwinn and his brother, whom he found to be appellant's agent.

Conceding appellant's innocence of any active part in the original fraud, he can not retain its fruits.

There is no question of estoppel in the case, because appellant did nothing to his prejudice in reliance upon the assignment. It became his duty, when he discovered the fraud through which the instruments had been transferred to him, to restore them to the rightful owner.

"The doctrine is universal, and prevails alike at law and in equity, that a person, though innocent, cannot avail himself of an advantage obtained by the fraud of another, unless there is some consideration moving from himself. It was long ago declared by Lord Mansfield that, 'although a third person shall not be punished for the fraud of another, he shall not avail himself of it. There is no case in the law where that can be done.'" *Atlantic Cotton Mills v. Indian Orchard Mills,* 147 Mass. 268, 17 N. E. 496, 9 Am. St. 698.

We conclude from the record that the judgment of the trial court was correct, and it is, accordingly, affirmed.

MILLARD, C. J., BEALS, and MAIN, JJ., concur.