Hillsborough, }
  Dec., 1900. }

BANK COMMISSIONERS *v.* SECURITY TRUST CO.

Interest allowable upon claims against an insolvent bank should be computed to the date of the appointment of the assignee.

The holder of a promissory note may assert his claim against a guarantor without demand upon the maker or notice of his default, and is not required, in proceeding upon the guaranty, to elect whether he will ultimately attempt to recover payment of the principal debtor.

Where a bank has guaranteed the payment of a promissory note, the holder may prove a claim in insolvency upon the guaranty for the full amount due, without regard to security given by the original debtor ; but where the bank has issued a certificate of deposit, the value of collaterals given to secure its payment should be deducted from the amount due in the allowance of the claim.

A beneficial owner of trust funds is not entitled to a preference over general creditors of an insolvent trustee unless the money can be traced into specific property in the possession of the assignee.

A claim for wages against an insolvent bank, in process of dissolution under the laws of this state, is not entitled to a preference by virtue of a statute of the state where the services were rendered.

PETITION, for the appointment of an assignee of the property and effects of the defendants, under section 15, chapter 162, of the Public Statutes. Some of the facts appear of record, and others were found by the commissioner appointed to allow claims. The defendants were incorporated by an act of the legislature. Laws 1889, *c.* 175. They carried on business in two departments, distinct from each other,— a trust and banking department and a savings department. An assignee was appointed October 9, 1896. He filed an inventory December 2, 1896, showing assets in the trust and banking department amounting to $744,260.77, of which

$31,682.25 was cash on hand and on deposit,— $19,892.71 of that on deposit being pledged to creditors. Further facts appear in the opinion.

*John Hatch*, for the plaintiffs.

*Edward H. Wason*, for Lester F. Thurber, assignee.

*Charles J. Hamblett*, for F. E. Anderson.

*Nathan P. Hunt* and *Taggart, Bingham & Drury*, for the Guaranty Savings Bank and the People's Fire Insurance Co.

*George B. French* and *Henry Heywood*, for Mary A. Gray, Henry Heywood, and Francis L. Towne.

*George B. French* and *William B. Fellows*, for the New Hampshire Conference Seminary and Female College.

*George B. French*, for the Peterborough Savings Bank, Margaret A. Johnston, Elizabeth A. Babcock, and Asa Jaquith.

*Elijah M. Topliff* and *Alfred T. Batchelder*, for the trustees of the New Hampshire Trust Co.

*Taggart, Bingham & Drury*, *Charles H. Burns*, and *Henry B. Atherton*, for David A. Gregg.

*Henry A. Cutter*, pro se.

*J. W. Simonton* (of Pennsylvania), *Henry B. Atherton*, and *Taggart, Bingham & Drury*, for J. W. Simonton.

*Harry E. Loveren*, for Eben L. Bartlett.

*Taggart, Bingham & Drury* and *Henry B. Atherton*, for James Russell.

*F. W. Estabrook, George A. Rollins*, and *F. D. Hutchins*, trustees, pro se.

*White Mountain Freezer Co.*, pro se.

*Alpheus Gay*, pro se.

CHASE, J.   1.   The commissioner allowed interest on claims to September 1, 1897.   The allowance should be to October 9, 1896, the date of the appointment of the assignee.   *Bank Comm'rs v. Trust Co.*, 69 N. H. 621.

2.   ·The defendants sold notes, some of which were secured by mortgages of real estate, and guaranteed the payment of the interest coupons attached to the notes at maturity and of the principal within two years after maturity, and reserved the right to repurchase the notes at any time at their face value with accrued interest added; or they simply guaranteed the payment of the principal and interest.   The holders of the notes have presented claims upon the guaranty, reserving their rights against the makers of the notes and their rights under the mortgages.

If there has been a failure of the principal debtor to pay principal, or interest, or both, as set forth in the contract of guaranty, no reason has been suggested or is perceived why the defendants are not liable to the full extent of their promise.   The consideration paid by the purchaser to the defendants for the note included consideration for the defendants' promise, and rendered it binding upon them.   The guaranty was an absolute promise to pay the debt, if the principal debtor failed to make payment at maturity or within the time specified.   Being unconditional, no demand upon the principal debtor or notice to the defendants of his default was necessary to create liability.   *Beebe* v. *Dudley*, 26 N. H. 249, 253; *Simons* v. *Steele*, 36 N. H. 73; *Bank of Newbury* v. *Sinclair*, 60 N. H. 100; *McDonald* v. *Fernald*, 68 N. H. 171.   Nor was the holder of the note obliged to bring and prosecute an action against the maker before attempting to assert his claim upon the guaranty. *Brown* v. *Curtiss*, 2 N. Y. 225; *Bishop* v. *Eaton*, 161 Mass. 496; *Morrison* v. *Bank*, 65 N. H. 253, 280.   He was at liberty to institute proceedings against the maker, or against the defendants, or against both concurrently, as he saw fit.   The maker's promise and the defendants' were, in this respect, independent of each other. If the holder obtained payment from the maker, it would discharge the liability of the defendants.   If he obtained payment from the defendants, it would entitle them to be subrogated to his rights against the maker, including the right to any collaterals held as security for the fulfillment of the maker's promise.   *In re Babcock*, 3 Sto. 393.   The holders of the defendants' guaranties, in presenting claims upon them to the commissioner for allowance, were therefore not called upon to elect whether they would ultimately attempt to hold the makers of the notes, and their reservation of the right to do so was immaterial.   If they receive a dividend from the defendants and also recover payment in full of the makers, they will hold so much of the excess as will re-imburse the defend-

ants for their payments, less proper allowances for costs and expenses, in trust for them or the assignee of their property.

3. In case the claimant, besides the defendants' guaranty, held a mortgage or other collateral security given by the maker to secure payment of the note, should the value of the collateral be deducted from the sum due upon the guaranty and the balance only be allowed against the defendants, or should the entire sum due upon the guaranty be allowed? A similar question, also raised in the case, is: Should the value of collaterals given to claimants by the defendants to secure the payment of certificates of deposit issued by them be deducted from the amounts due upon the certificates in the allowance of the claims? The two questions have so many features in common that they may conveniently be considered together.

The law on this subject was particularly reviewed in the opinions of the court in *Merrill* v. *Bank*, 173 U. S. 131. There appear to be two lines of decisions, one establishing what is known as the bankruptcy rule, by which secured creditors are allowed to prove only the balance of their claims above the value of their securities; and the other establishing what is known as the chancery rule, by which such creditors are allowed to prove their claims in full without regard to their securities. In the case cited, the supreme court of the United States, by a bare majority of the justices,—four dissenting,—adopted the latter rule for the allowance of claims against an insolvent national bank preparatory to a distribution of its assets. The majority opinion rests on the ground that this rule is supported by sounder reasoning than is the other, and by a preponderance in the weight of authorities; and, since the national banking act did not specially adopt the bankruptcy rule, the chancery rule was the one intended. The minority opinions vigorously controvert each of these positions. In consequence of the division in the court, the value of the case as an authority consists in the ability and exhaustiveness of the discussion rather than in the conclusion reached.

From 1820 to the present time, the supreme court of Massachusetts has followed the bankruptcy rule in the allowance of claims against the estates of deceased persons settled as insolvent. *Amory* v. *Francis*, 16 Mass. 308; *Hale* v. *Leatherbee*, 175 Mass. 547, 549. The question was first considered in this state in 1822, in the case of *Moses* v. *Ranlet*, 2 N. H. 488, and the decision was in favor of the chancery rule. The case was an appeal from the decision of commissioners allowing the claim of a mortgagee of real estate against the estate of a deceased person in full, without regard to the mortgage. It was said in the opinion that "the death of the debtor cannot in itself change the principles of jus-

tice or the terms of the contract; and the statute does not pro-
fess to make any change, except to introduce an equal dividend
among the creditors, of such estate as belonged to the insolvent at
his death"; and further, in substance, that the bankruptcy rule
changes the law in respect to pledges and mortgages, and that the
making of such a change "belongs to the legislative rather than
the judiciary department." Of *Amory* v. *Francis*, it was said
that it seemed to be opposed to the weight of authority. Upon
the revision of the statute law of the state in 1842, the change
suggested was made by the legislature. It was then enacted, in
substance, that if any creditor holds collateral security of less
value than his debt, the commissioner shall estimate the value of
the security and allow the difference between it and the debt; and
that if the creditor, being dissatisfied with the estimate, relin-
quishes his interest in the security and delivers it to the adminis-
trator, it shall be sold by him under the direction of the judge,
and the proceeds shall be paid to the creditor, and the difference
between the sum so paid and the amount of the claim shall be in-
serted upon the list of claims. R. S., c. 162, ss. 10, 11. These
provisions are still in force. P. S., c. 192, ss. 11, 12.

In 1862, similar provisions were introduced into the statute in
relation to assignments for the benefit of creditors, and have been
continued therein ever since. Laws 1862, c. 2594, ss. 8, 9; P. S.,
c. 201, s. 20. It thus appears that the bankruptcy rule has been
adopted by special statutory provisions for the allowance of the
claims of secured creditors against the estates of insolvents, both
living and deceased.

The questions now under consideration arise in a proceeding
under the statute relating to the winding up of the affairs of in-
solvent banks, loan and trust companies, and other similar insti-
tutions. This statute provides that the court, upon application
of the bank commissioners, may enjoin such an institution from
transacting business and may appoint an assignee, who shall take
possession of all its estate, property, rights, and credits, and may
require the institution, or others having title to its property, to
execute a transfer or conveyance to him. He is authorized to sell
and convey the property, and to do any act necessary to convert
it into money. The court, or any justice of the court in vaca-
tion, may make orders necessary to carry the assignment into ef-
fect, and may affix penalties for disobedience. They may restrain
creditors from prosecuting proceedings at law against the institu-
tion, and require them to present and prove their claims before
such persons and within such time as the court may direct, or be
precluded from all benefit of the assets. The proceeds of the
property of an institution of the kind under consideration, after

payment therefrom of the expenses of the assignment, are to be distributed according to the decree of the court, "for the payment in equal proportion of all debts, claims, and obligations owing by the institution." At the expiration of one year after the final decree of distribution, the assignee is required to report to the court the names and residences of persons entitled to dividends who have not claimed them, whereupon the court may order them to be paid to the state treasurer; and in such case the treasurer is directed to pay them without interest, less a commission for his services, to the parties entitled to them on demand, if claimed within fifteen years; and all that are not so claimed escheat to the state. P. S., c. 162, ss. 12–25. In view of these provisions, the general question under consideration becomes resolved into this: Which rule for the allowance of secured claims did the legislature intend to adopt in the proceedings,— the bankruptcy, or the chancery rule? It may be said that the absence of special provisions similar to those contained in the other insolvency statutes has a tendency to show that the chancery rule was intended. This negative fact, however, is not the only evidence bearing on the question. The provisions form a complete system of insolvency under which the property of an insolvent institution may be placed in the custody of the law, converted into money, and divided among its creditors. *Brown* v. *Folsom*, 62 N. H. 527, 528; *Bank Comm'rs* v. *Trust Co.*, 69 N. H. 621, 622. By the assignment, the corporation practically is dissolved. "It may have legal existence and have the usual officers, but only for the purpose of carrying into effect the objects of the assignment. The operations of the bank are stopped,— are never expected to be resumed; for the whole object of the assignment is to collect and preserve the property of the bank and make distribution of the assets according to the provisions of the statute." *In re White Mts. Bank*, 46 N. H. 143, 145. The general character and object of these provisions being the same as those of the other insolvency statutes, it is a natural and almost irresistible inference that the legislature understood the same rule would govern in the proof of claims.

But it may be said that the circumstance that the bankruptcy rule impairs to some extent the rights of creditors shows that it was not the rule intended. In passing, it should be noted that the effect of the rule in this respect, when applied in an insolvency proceeding against a banking institution, would not differ in nature, extent, or degree from its effect in the cases for which it has been expressly adopted; and that the rights of the creditors of such institutions are no greater or more sacred than those of the creditors of other parties. In all insolvency proceedings the rights of creditors are necessarily impaired more or less. Upon the com-

mencement of the proceedings a creditor's right to bring actions at law against the debtor to enforce his claims terminates. In fact, the creditor ceases to be such in a strictly legal sense, and becomes, in common with the other creditors, one of the *cestuis que trustent* of the debtor's property. His claims may cease to bear interest, although by the terms of the contract he is entitled to interest. He may be compelled to accept part, for full, payment. A necessity for a complete settlement of the affairs of the debtor is created. This necessity is particularly manifest in the case of a banking institution; for being practically dissolved by the proceedings, there can be no further dealings between it and the creditors except as incident to the proceedings, and at the end the institution will have nothing left with which to satisfy debts. The settlement requires an adjustment of the insolvent's affairs as of a particular date, and the date adopted in this state is the day when the proceedings are begun. *Bank Comm'rs* v. *Trust Co.*, 69 N. H. 621. The law contemplates such an adjustment with secured as well as unsecured creditors. To effect it in the case of the former, if the securities are not redeemed or the creditor's right to them is not released or waived, they must be converted into money or their value be ascertained, and the money or value must be applied, so far as necessary, to satisfy the debt. When a creditor attempts to prove his claim preparatory to a dividend from the unpledged assets, he is not called upon to give up his securities, but only to have them disposed of or valued and applied to the payment of the debt. The only change that is made in his contract in this respect is the fixing of a day certain as to which settlement must take place. Before the institution of the proceedings it might be brought about at the will of either of the parties, in the absence of special provisions fixing a time of settlement; but afterward it must take place as of the date of the assignment. This change resembles in character that by which the creditor is disabled from bringing actions at law after the proceedings are begun. The answer to the question whether it injuriously affects the rights of the creditor depends upon the standpoint from which the question is viewed. If the standpoint is that of insolvency or bankruptcy laws, no injustice appears. It must be presumed that the contract creating the indebtedness was made with reference to such laws and subject to the liability of being changed or modified by their operation in case of the debtor's insolvency or bankruptcy.

It is said, in substance, in the dissenting opinions in *Merrill* v. *Bank*, 173 U. S. 131, 154, 155, 156, 161, that the incorporation of the bankruptcy rule into the bankruptcy statutes of England and this country was only an embodiment into legislative acts of what

theretofore had been universally regarded as the law in such cases from the earliest time. In England, after the chancery rule had been adopted by the court in *Mason* v. *Bogg*, 2 Myl. & C. 443, for the proof of claims against the estates of persons deceased settled as insolvent, and in *Kellock's Case*, L. R. 3 Ch. App. 769, for the proof of claims in the winding up of the affairs of corporations, the bankruptcy rule was substituted by acts of parliament. Judicature Act of Aug. 5, 1873, c. 66, s. 25 ; amendment thereof Aug. 11, 1875, c. 77. *Jessel*, M. R., says : "As regards section 10 of the judicature act, 1875 [which makes the substitution referred to in the settlement of insolvent estates of deceased persons], one object and probably the principal object of the section was to get rid of the rule established by *Mason* v. *Bogg* as to proof in chancery by secured creditors." *In re Hopkins*, L. R. 18 Ch. Div. 370, 377. And so in this state, after the court had adopted the chancery rule in *Moses* v. *Ranlet*, 2 N. H. 488, the legislature substituted the bankruptcy rule. It is a fair inference that these legislative bodies were of opinion that the bankruptcy rule worked substantial justice in such cases, and was necessary in a system of insolvency laws designed to effect a complete settlement of the affairs of insolvent debtors. The legislature of this state, having this opinion of the rule and knowing of its utility and general adoption, would be quite likely to regard it as an incident to such laws, and to omit special mention of it in a statute that must necessarily be more or less general in terms, especially when they had recognized its necessity in a kindred statute contained in the same revision of the laws. R. S., c. 162, ss. 10, 11 ; *Ib.*, c. 140, s. 37.

The conclusion is that the legislature intended the bankruptcy rule should apply in the proof of secured claims against insolvent banking institutions. Although the chancery rule may be supported by the weight of authority (see list of authorities in 173 U. S. 168, 169, notes, and 3 Am. & Eng. Enc. Law, 2d ed., 141), it appears to have been discarded by the legislature of this state in this as well as in the other instances referred to. Claimants holding the defendants' certificates of deposit are entitled to prove for the balance of their claims above the proceeds or value of their collaterals. If they and the assignee cannot agree upon the value of the collaterals, or upon some method of disposing of them, the court will make some order for the purpose. If a creditor sees fit not to prove his claim, he will hold his collaterals ; and if there is any valuable equity in them for the estate, the assignee can get the benefit of it by redeeming them.

The rule does not apply to the cases in which the defendants have sold notes secured by mortgage or pledge, and guaranteed their payment. In such cases, as has already been seen, the defendants'

promise is independent of that of the maker of the note. The creditor holds no security for the defendants' promise. The defendants have no equity in the property mortgaged or pledged to secure the debt; the property is no part of the estate under administration. The maker's equity in the property cannot be taken from him by an agreement between the creditors and the assignee, nor, since the maker is not a party to the proceeding, by any action of the court. The only way in which the defendants or the assignee can get the benefit of the collaterals is to fulfill the guaranty and as a consequence be subrogated to the creditors' rights. *Ex parte Parr*, 1 Rose 76; *S. C.*, 18 Ves. 65; *Ex parte Goodman*, 3 Madd. 373; *Ex parte Bowden*, 1 D. & Ch. 135; *Ex parte Bloxham*, 6 Ves. 449; *In re Plummer*, 1 Phil. Ch. 56; *Rolfe* v. *Flower*, L. R. 1 P. C. 27, 46; *In re Babcock*, 3 Sto. 393, 399, 400; *Crocker* v. *Gilbert*, 9 Cush. 131; *Hale* v. *Leatherbee*, 175 Mass. 547. Creditors holding the defendants' guaranties are entitled to prove the full amounts due upon them, without regard to the securities which the creditors may hold from the original debtor.

4. Several claimants seek a preference over unsecured creditors in the distribution of the assets, by reason of the fact that their claims are for collections made by the defendants, in some cases with the claimants' authority and in others without such authority, upon notes owned by or pledged to the claimants. The collections were made during a year or more prior to the appointment of the assignee. Real estate mortgages standing in the name of the defendants upon the records, although sold and transferred to the claimants with the notes secured by them, were, in some cases, foreclosed by the defendants in their name, and the nominal title to the property is still in them. In a few cases the defendants issued certificates of deposit for the amounts collected and offered them, together with collateral security for their payment, to claimants, some of whom accepted them and others declined to accept them.

These facts are of such a general nature that little can be done more than to state the rules of law that govern such cases, leaving for future consideration the application of them to the special facts of the several cases. Economy in the expenditure of money and time by the parties in interest seems to require that this somewhat unusual course should be pursued.

The first question that naturally arises in each case is: What was the relation between the defendants and the claimant in respect to the particular claim? Was it that of debtor and creditor, or that of trustee and *cestui que trust*, agent and principal, or was it of other fiduciary character? If it was that of debtor and creditor, the question of preference would vanish, for the statute makes no distinction as to such debts. In common with other

claims, they would be payable " in equal proportion."   P. S., *c.* 162, *s.* 20.   The mere fact that the claims are for money collected by the defendants on account of the claimants does not necessarily show that the defendants are not ordinary debtors.   The claimants may have left the money on deposit with the defendants as bankers, or agreed that they should have the use of it for the time being. If there was no express agreement on the subject, the course of dealing between the parties may have been such as to prove the existence of an implied agreement.   In either case the defendants would be debtors, not trustees.   The agreement, whether express or implied, would supersede the rights arising from a fiduciary relation, if one previously existed.

If it were found that the relation was that of trustee and *cestui que trust*, or was of a fiduciary character, it would not follow that the claimants would be entitled to the relief they now seek.   In *Cavin* v. *Gleason*, 105 N. Y. 256, 262, it is said : " It is clear, we think, that upon an accounting in bankruptcy or insolvency a trust creditor is not entitled to a preference over general creditors of the insolvent merely on the ground of the nature of his claim — that is, that he is a trust creditor as distinguished from a general creditor. We know of no authority for such a contention.   The equitable doctrine that as between creditors equality is equity admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it appears in addition that there is some specific recognized equity founded on some agreement or the relation of the debt to the assigned property which entitles the claimant, according to equitable principles, to preferential payment."   See, also, *Atkinson* v. *Company*, 114 N. Y. 168, 175.

If there is property in the possession of the assignee that was held in trust by the defendants, the *cestuis que trustent* are entitled to their interest in it notwithstanding the assignment.   A transfer of such property to the beneficial owners or to a new trustee for their benefit would not diminish the estate of the defendants that is subject to the payment of their debts ; nor would it matter what or how many changes were made by the defendants in the investment of the trust property, or whether the changes were authorized or unauthorized, provided the identity of the property was preserved.

The same principle would apply and cause the same result if the defendants, instead of being trustees of the fund, held it as agents or in a fiduciary capacity.   2 Sto. Eq. Jur., *s.* 1258.   In an early case in which it appeared that money paid to a stock-broker for the purchase of particular securities was used by him in purchasing

other securities and bullion with an intention of embezzling the same, it was held that the owner of the money, if he so elected, was entitled to the securities and bullion as against the assignees of the broker. *Taylor* v. *Plumer*, 3 M. & S. 562. In the course of the opinion, Lord *Ellenborough*, C. J., said (*p.* 575) : " It makes no difference in reason or law in what form different from the original the change [in the property] may have been made, whether it be into that of promissory notes for the security of the money which was produced by the sale of the goods of the principal, as in *Scott* v. *Surman*, Willes 400, or into other merchandise, as in *Whitecomb* v. *Jacob*, Salk. 160, for the product of, or substitute for, the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail, which is the case when the subject is turned into money and mixed and confounded in a general mass of the same description." So far as has been noticed, the first part of this proposition has never been questioned ; but the statement at the end of it, that the right ceases when the subject is turned into money and loses its identity by being mixed with other money, was denied in *In re Hallett's Estate* (frequently cited *Knatchbull* v. *Hallett*), 13 Ch. Div. 696. In that case, *Jessel*, master of the rolls, says in substance that, by the very clear and well established " modern doctrine of equity " (as he terms it) relating to rights in property disposed of by a person in a fiduciary position, there is no distinction between a rightful and wrongful disposition so far as the right of the beneficial owner to follow its proceeds or substitute is concerned. If a person purchases property with money held in a fiduciary capacity, the beneficial owner has an election to take the property or to have a charge upon it for the amount of his money. If the person mixes the money with his own and purchases property with the entire sum, there is this distinction, that the beneficial owner cannot elect to take the property because it was not bought with his own money exclusively, but he is entitled to a charge on it for the amount of his money laid out in the purchase without regard to the amount of the trustee's individual money so used. The master of the rolls quotes the language of Lord *Ellenborough* above quoted, and concerning the first part of the proposition says : " That, if I may say so, is law at the present moment ; and though I cannot say it always was law, it always ought to have been law, because it is consonant with reason." As to the other portions, he says : " Now comes the point, ' and the right only ceases when the means of ascertainment fail.' That is correct. Now there comes a point which is not correct, but I am afraid only ceases to be correct because Lord *Ellenborough's* knowledge of the rules of equity was not quite commensu-

rate with his knowledge of the rules of common law,— 'which is the case when the subject is turned into money and mixed and confounded in a general mass of the same description.' He was not aware of the rule of equity which gave you a charge — that if you lent £1,000 of your own and £1,000 trust money on a bond for £2,000, or on a mortgage for £2,000, or on a promissory note for £2,000, equity could follow it and create a charge; but he gives that, not as law,— the law is that it only fails when the means of ascertainment fail,— he gives it as a case in which the means of ascertainment fail, not being aware of this refinement of equity by which the means of ascertainment still remain. With the exception of that one fact, which is rather a fact than a statement of law, the rest of the judgment is, in my opinion, admirable." Accordingly, it was decided that the owner of certain bonds, sold by Hallett without authority while held by him in a fiduciary capacity, had a charge upon the balance due Hallett from his bankers on account of the deposit of the proceeds of the bonds and money of his own with the bankers to his individual credit in one account.

In a case decided in 1894, the trustees of a fund authorized their bankers to collect certain debentures. The bankers had occasion to pay the parties from whom the collection was to be made a larger sum than was due upon the debentures, and settled the two transactions by offsetting them and paying the balance. The bankers became bankrupts before paying over the money collected, and the trustees' motion that they be paid in full was denied. Lord *Esher*, M. R., said: "Although the result of the transaction was only to make them [the bankers] debtors to their customer, yet if the money, which was trust money, could be followed, and if it could be shown what was done with that actual money, the doctrine of following the trust would apply. But this is the difficulty in the case. . . . All that can be shown is a settlement of account, and a settlement of account cannot be followed." *Davey*, L. J., said: "There is nothing in our decision in the present case which is in conflict with the decision in *In re Hallett's Estate*, 13 Ch. Div. 696. In order to follow trust money there must be specific property capable of being identified, into which the money has been converted. . . . That decision in no way qualifies the rule that there must be a specific thing capable of being followed." *In re Hallett, ex parte Blane*, L. R. 2 Q. B. Div. 237. According to these decisions, the foundation upon which the beneficial owner's preference rests is the fact that his money or property has gone into specific property and so made it in whole or in part equitably his property, and not the fact that the trustee or agent wrongfully converted the property to his own use. It is indeed immaterial whether the disposition of the property was rightful or wrongful.

Says *Jessel*: "You can, if the sale was rightful, take the proceeds of the sale, if you can identify them. If the sale was wrongful, you can still take the proceeds of the sale, in a sense adopting the sale for the purpose of taking the proceeds, if you can identify them. There is no distinction, therefore, between a rightful and a wrongful disposition of the property, so far as regards the right of the beneficial owner to follow the proceeds." *In re Hallett's Estate*, 13 Ch. Div. 696, 708, 709.

There is a large number of cases in this country relating to this matter, and the great majority of them hold that the beneficial owner must trace his money or property into some specific property in the possession of the representative of the trustee or fiduciary agent to entitle himself to a preference over general creditors; and that the preference will then consist of the right to appropriate the latter property or to have it charged with his debt. "When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it fails. Under such circumstances, if the trustee has become bankrupt, the court cannot say that the trust money is to be found somewhere in the general estate of the trustee that still remains; he may have lost it with property of his own; and in such case the *cestui que trust* can only come in and share with the general creditors." *Little* v. *Chadwick*, 151 Mass. 109, 110, 111. The following, being some of the more recent authorities on the subject, support these propositions: *Goodell* v. *Buck*, 67 Me. 514; *Houghton* v. *Davenport*, 74 Me. 590; *Slater* v. *Oriental Mills*, 18 R. I. 352; *Cavin* v. *Gleason*, 105 N. Y. 256; *American Sugar Refining Co.* v. *Fancher*, 145 N. Y. 552; *Union Nat'l Bank* v. *Goetz*, 138 Ill. 127; *Freiberg* v. *Stoddard*, 161 Pa. St. 259; *Ferchen* v. *Arndt*, 26 Or. 121; *Englar* v. *Offutt*, 70 Md. 78; *Drovers etc. Bank* v. *Roller*, 85 Md. 495; *Northern Dakota Elevator Co.* v. *Clark*, 3 No. Dak. 26; *St. Louis Brewing Ass'n* v. *Austin*, 100 Ala. 313; *Shields* v. *Thomas*, 71 Miss. 260; *National Bank* v. *Insurance Co.*, 104 U. S. 54; *Peters* v. *Bain*, 133 U. S. 670, 693.

It has been held in a few cases that the beneficial owner has a charge upon the general estate in the possession of the representative of the trustee or fiduciary agent if it appears that the fund went into the estate, although it cannot be traced to any specific property. This doctrine is suggested but not passed upon in *York* v. *York Market Co.*, 68 N. H. 419. *McLeod* v. *Evans*, 66 Wis. 401, is one of the earliest cases, if not the earliest, which has gone so far, and appears to have been relied on in other states where the

doctrine has been adopted. Two of the five judges dissented from the decision. The case has been practically overruled, and the recent decisions of the Wisconsin court are in harmony with the weight of modern authority. In several of the cases the question is considered at considerable length and with much ability. *Nonotuck Silk Co.* v. *Flanders*, 87 Wis. 237; *Henry* v. *Martin*, 88 Wis. 367; *Burnham* v. *Barth*, 89 Wis. 362; *Dowie* v. *Humphrey*, 91 Wis. 98; *Brownley* v. *Railway*, 103 Wis. 562. The Kansas court for a time took this view of the law (*Peak* v. *Ellicott*, 30 Kan. 156; *Myers* v. *Board of Education*, 51 Kan. 87; *Hubbard* v. *Irrigation Co.*, 53 Kan. 637), but subsequently fell into line with the majority of the courts, and attempted to distinguish its earlier cases without expressly overruling them. *Burrows* v. *Johntz*, 57 Kan. 778; *Travellers Insurance Co.* v. *Caldwell*, 59 Kan. 156; *Kansas State Bank* v. *Bank*, 9 Kan. App. 839. The Iowa court followed the earlier Wisconsin and Kansas cases in *Independent District of Boyer* v. *King*, 80 Ia. 497, and *Davenport Plow Co.* v. *Lamp*, 80 Ia. 722; but later found it necessary to explain and, it seems, qualify their decisions. *Jones* v. *Chesebrough*, 105 Ia. 303. In this case it is said: "While we have not adhered to the rule that to justify a preference the money must be identified or traced to a particular fund of which it is all or part, . . . we have held that, before such a preference can be sustained, it must appear that the estate has been so benefited by the misappropriation of the trust fund that its removal or its equivalent from the estate will be without prejudice to creditors; in other words, that the conditions must be such that the creditors have the same protection as if the trust money had been retained in the bank in a way that it could be identified and taken, which latter would be the right of a *cestui que trust* under all authorities." In Missouri the court has aligned itself with what it terms "the modern equity rule." *Harrison* v. *Smith*, 83 Mo. 210; *Stoller* v. *Coates*, 88 Mo. 514. The other rule seems to have been followed in *Phillips* v. *Overfield*, 100 Mo. 466; but it is said in *Leonard* v. *Lattimer*, 67 Mo. App. 138, that it does not at all impair the authoritative force of the other cases,— that "the cases are not analogous." *Smith* v. *Combs*, 49 N. J. Eq. 420, is liable to be classed in this line of authorities; but in the very recent case of *Ellicott* v. *Kuhl*, 46 Atl. Rep. 945, decided by the prerogative court of New Jersey in July, 1900, it was said that in the former case the trust fund was traced into bank stock held by the trustee at the time of his death, and that the decision was that the *cestui que trust* was "therefore entitled to claim its proceeds, not as a preferred debt, but as property to which he had a right as against the deceased or those who claimed under him."

The difference in the authorities after all mainly relates to the

application of the rule, rather than to the rule itself. Generally, it is difficult, and not infrequently impossible, to trace the fund into specific property of the estate under administration. In some cases courts in attempting to overcome the difficulty have assumed that a fund which went into the estate in the past is there still, or have found this to be the fact from insufficient evidence or by fallacious reasoning. In other cases the underlying principle of the rule seems to be overlooked, and the question is treated as if indebtedness arising from a breach of trust was entitled to preference in payment over ordinary indebtedness,— an erroneous view of the law, as has been seen.

A claimant who seeks a preference by reason of a trust is called upon to prove the existence of the trust. In the absence of testimony on the point, there is no presumption that a trust exists. Proving that there was a trust at one time in particular property does not prove that the trust is impressed upon other property at a later time, without showing that the latter is the proceeds or substitute of the former. In this case, proof by the claimants that the defendants, acting in a fiduciary capacity, collected money for them a year or six months, or a longer or shorter time before the appointment of the assignee, does not prove that the money or property into which it may have been converted was on hand at the time the assignee took possession, nor that the estate as a whole was then larger or more valuable than it would have been otherwise. The money may have been lost, used in the payment of expenses or debts, or invested in securities which turned out to be worthless. The payment of debts with the money would simply transfer the defendants' indebtedness from one person to another; it would not increase the value of their estate as a whole, or the value that would be left after the payment of debts. The money would go into the debt, and if a trust was impressed upon anything by the change it must be upon that. This, however, would be of no practical benefit to the beneficial owner of the money unless the debt was secured in some way. In that event the debt with its security, if in existence, might be revived and charged with a trust in his favor.

Misappropriation of the money could have no retroactive effect to impress a trust upon property already held by the defendants and not procured by means of the money. If the money was mixed with other money, or with other money was deposited in a bank, loaned upon a promissory note, or invested in other securities or property which came into the possession of the assignee, the claimant could have a charge upon the money, deposit, note, securities, or property, and in that way gain a preference over ordinary creditors. If the money was kept or deposited with other

money, and the sum varied from day to day by reason of additions and withdrawals, there would be occasion for taking into account a presumption that the defendants were acting in good faith and so that the withdrawals were of their own money. *In re Hallett's Estate*, 13 Ch. Div. 696. This presumption does not exist, however, when the question is whether the money is in the estate as a whole, for then bad faith is shown by the use of the money.

From these considerations it appears that it is necessary to trace the money through the various changes in its investment to specific property, in severalty or in mass, in the possession of the assignee, to create a trust or charge in favor of a claimant. The tracing is a matter of fact, not law. It must be done, as in the decision of other questions of fact, by the consideration and weighing of competent evidence bearing on the question. If it does not appear by a preponderance in the weight of the evidence that the assignee received the money or property in which it was ultimately invested, the claimant must fall back on his rights as an ordinary creditor.

If mortgages belonging to claimants have been foreclosed by the defendants in their own name, with or without authority, and the nominal title to the property is still in them, they hold the property in trust for the owners of the mortgages. *Jordan* v. *Cheney*, 74 Me. 359. In cases where claimants have accepted certificates of deposit with collaterals for collections made in their behalf, their rights are governed by the new contract thus made. If claimants declined to accept certificates and collaterals tendered them, their rights would not be affected by the tender.

5. Between November 29, 1894, and the date of the assignee's appointment, the defendants, without the authority or knowledge of the owners, collected sundry notes secured by mortgage belonging to the trustees of the New Hampshire Trust Company, and discharged the mortgages. The notes and mortgages formerly belonged to the defendants, and were sold and delivered by them to the Trust Company, assigned in blank, and have been in the possession of the latter and its trustees ever since. The assignments of the mortgages were not recorded. The commissioner allowed the amount of the collections with interest as a preferred claim.

It is evident that the foregoing facts do not warrant a preference in the payment of this claim under the rules of law above mentioned, and the commissioner's allowance in that respect is set aside.

6. One Brackett claims a preference in the payment of a trust fund of $2,000 created by a will, of which fund the defendants were trustees by appointment of the probate court.

This question is governed by the general rule just considered.

See, also, *In re Lebanon Trust & Safe-Deposit Bank's Estate*, 166 Pa. St. 622. If the defendants deposited the fund in their savings department, Brackett's claim would stand like that of other depositors in that department. The defendants were authorized by their charter to act as trustees under judicial appointment (Laws 1889, c. 175, s. 1), and the question in that respect is the same as that decided in *Tucker* v. *Trust Co.*, 69 N. H. 187.

7. The defendants bargained 160 acres of land in North Dakota to Katherine and John Morris for $3,070, taking their notes for $1,200, $1,500, and $370, and agreeing to convey the land free of incumbrances upon payment of the notes. They sold the $1,500 note to Henry A. Cutter and the $1,200 note to the Wilton Savings Bank before they became due. It was found that there was an outstanding mortgage upon the land for $1,050. Cutter and the bank have purchased this mortgage. The Morrises are ready to pay for the land according to their contract. The claimants ask that they be paid in full from the money coming from the Morrises, and that the mortgage be paid in full from other assets of the defendants.

The claimants' money partially paid the defendants for the real estate bargained by them to the Morrises. The defendants holding the title to an interest in this real estate at the time of the appointment of the assignee, and the claimants' money having been traced to it, they are entitled, by the rule previously stated, to have such interest charged for the payment of their notes. The defendants' interest turned out to be the right to redeem the real estate from the $1,050 mortgage. If this is not of sufficient value to pay the notes in full, the claimants must share with other unsecured creditors in the general assets for the balance. No ground, legal or equitable, has been suggested upon which they are entitled to have the mortgage paid in full from such assets in the first instance, and none has occurred to the court.

8. Carrie F. and W. B. Bosard gave the defendants three notes for $2,000, $1,000, and $1,500 respectively, dated October 28, 1892, and secured the payment of the $1,500 note by a mortgage on certain real estate in North Dakota, and of the other two notes by a mortgage of the same real estate recorded some twenty minutes later than the record of the first one, and by a pledge of notes, etc., amounting to $3,100. The defendants sold the $2,000 and $1,000 notes and mortgage to Eben L. Bartlett, December 1, 1892, representing that the mortgage was a first lien on the property and guaranteeing payment of the notes; and later they assigned the $1,500 note and mortgage to another party. They did not transfer the collateral notes to Bartlett, nor inform him of their existence. The defendants have collected $2,195.78 upon

the collaterals and have used the money. Bartlett claims payment of this sum in preference to other unsecured creditors.

If the sale and transfer of the Bosard notes to Bartlett incidentally transferred also the defendants' interest in the collaterals pledged for the payment of the notes (*Esty* v. *Graham*, 46 N. H. 169), or if in consequence of the defendants' guaranty Bartlett was equitably entitled to the benefit of the securities held by them (*Keene etc. Bank* v. *Herrick*, 62 N. H. 174 ; *Hunt* v. *Association*, 68 N. H. 305, 307, 308), he would not necessarily be entitled to a preference in the payment of the money collected by the defendants upon the collaterals. His right in that regard would depend upon his ability to prove that the money or its substitute went into the possession of the assignee, as has already been shown. Without such proof, the claim would be no better than one made upon the guaranty; and it would become immaterial to him whether he was entitled to the benefit of the collaterals or not.

9. One Slack borrowed $1,200 of the defendants and gave a note therefor secured by a mortgage of 320 acres of land in North Dakota. The defendants sold and delivered the note and mortgage assigned in blank to J. W. Simonton, and guaranteed the payment of principal and interest. Simonton has had possession of them ever since. The assignment of the mortgage was not recorded. Subsequently the defendants obtained Slack's equity, and in December, 1895, sold and conveyed one half of the land to other parties for $1,750, releasing the claimant's mortgage thereon without his authority or knowledge. Of the proceeds, $320 was paid for taxes on the property. Simonton claims a preference in the payment of his note.

It does not appear that Simonton is entitled to a preference under the rule above mentioned.

10. September 25, 1896, the defendants sent to Henry Heywood and Francis L. Towne certificates of deposit issued by the defendants in payment for the proceeds of two notes, secured by mortgages of real estate in North Dakota, collected by them without authority from the claimants, and then and still in the claimants' possession. The mortgages, having been originally made to the defendants and being assigned in blank, were discharged by the defendants when they collected the notes. The defendants sent with the certificates of deposit two notes to be held as collateral security for their payment. The claimants retained the certificates and collateral notes, and now assert title to the latter as against the assignee.

Upon these facts it would seem that the claimants ratified the acts of the defendants in making the collections and accepted the

certificates of deposit with the collateral notes in payment of the sums collected. If so, they are entitled to the benefit of the collaterals. They should surrender the notes and mortgages originally held by them to the assignee, so that they may be forwarded to the parties entitled to them.

11. In July, 1894, the defendants sold and delivered to Mrs. Mary A. Gray a note for $1,200 against one Phelps, dated November 22, 1892, payable to the defendants or order January 22, 1898, with interest according to coupons attached, and secured by a mortgage of real estate in North Dakota. By the terms of the note, if any interest coupon was not paid within ten days after it became due, the principal and all accrued interest became due and payable at the election of the payees or their assigns. The defendants assigned the mortgage in blank, but the assignment was not recorded. They guaranteed the payment of the principal and interest, and reserved the right to purchase the note at any time for its face value and accrued interest. Mrs. Gray has had the note and mortgage in her possession ever since she purchased them. The maker of the note did not pay the coupons as they became due, but the defendants advanced to Mrs. Gray the sums represented by those due May 1, 1896, and prior, and took up and held them until the assignee was appointed, when they were inventoried as assets. Mrs. Gray was not informed of the default of the maker. At the time of the sale the defendants' agent represented to Mrs. Gray that two outstanding liens upon the real estate — one in favor of the Vermont Loan & Trust Company for $800, and the other in favor of the defendants for $500 — had been paid or would be paid from the money received from her, making her mortgage the first lien on the property. The Vermont Company's lien was not paid. About February, 1895, the defendants, without the knowledge or consent of Mrs. Gray, discharged her mortgage and caused a new mortgage to be given to the Vermont Company for the amount then due them, being $1,100. The defendants subsequently acquired a title to the equity in the real estate, which is now one of their assets. The assignee, under an order of the court, has paid all taxes assessed upon the real estate and has purchased the Vermont Company's mortgage. Mrs. Gray claims that she should be paid the balance due upon her note from the defendants' assets, in preference to unsecured creditors.

Mrs. Gray is clearly entitled to be restored to the position she occupied with reference to this real estate at the time the defendants wrongfully discharged her mortgage. There is no practical difficulty in making such restoration, since the estate now owns the property and the Vermont Company's prior mortgage upon it, or, which is the same thing in effect, a renewal of that mortgage.

It may be done by charging this particular real estate, first, with the payment of the amount due upon the Vermont Company's mortgage at the time of the discharge of Mrs. Gray's mortgage, and, secondly, with the payment of the amount due upon her mortgage. By reason of the representations made to Mrs. Gray at the time of her purchase, the defendants' $500 mortgage does not take precedence of her mortgage. It would seem from the order of the court that the defendants' equity in this real estate is regarded as of some value. Whether Mrs. Gray's mortgage was taken into account when the order was made does not appear. If it was, and the real estate is sufficiently valuable to pay both mortgages, there will be no occasion to consider whether the purchase by the assignee of the Vermont Company mortgage affected the priority of the charges upon the real estate. It should be remarked, however, that substantial justice is done between Mrs. Gray and the unsecured creditors of the estate — the real parties in interest to the question — by restoring her to her original position as to security. The promise made to her by the defendants to pay the prior liens upon the property with the money received from her was no more sacred than the promises made to unsecured creditors. She, the same as they, took the risk of the performance of the promise. She might very properly have insisted that the prior mortgages should be paid and discharged before she paid her money. The claim that she makes to be paid her note in full from the general assets cannot be allowed.

12. In 1891 or previously, the Dakota Investment Company sold and transferred to Alpheus Gay a note for $900, due in September, 1894, secured by a mortgage of real estate in Minnesota, and guaranteed its payment. The transfer of the mortgage was not recorded. In April, 1891, they foreclosed the mortgage for a default in the payment of interest, and took possession of the property. Subsequently, in the same year, they sold and assigned all their property, including that acquired upon the mortgage, to the defendants, who assumed all their obligations. In September, 1894, the defendants extended the time of payment of the note five years, and took coupons from one Schnitz for the prospective interest. It did not appear what connection Schnitz had with the property. In 1896, they bargained the property to one Hickcox for $800, of which $50 was paid down and the balance was to be paid in instalments, the last to become due in November, 1901. Hickcox went into possession and was to have a deed when he paid the consideration in full. He is able and willing to fulfill his contract. The defendants paid to Gay the interest accruing on his note down to May, 1896, although none was received by them of the maker of the note. The foreclosure and the contract with

Hickcox were made without the knowledge or consent of Gay. He claims the benefit of the defendants' contract with Hickcox, and that he should share with other unsecured creditors for the balance due upon his note.

The Dakota Company's foreclosure was of the mortgagor's right to redeem from the Gay mortgage. It did not affect Gay's right to hold the property as security for the payment of the balance due upon his note. The defendants so treated the matter after they acquired the Dakota Company's title. For nearly five years they paid interest to Gay as if the note and mortgage were outstanding, although they received no interest from the maker of the note. The contract with Hickcox cannot be completed without Gay's co-operation. Gay's proposition to ratify it provided he is paid the money due from Hickcox seems reasonable. His right to the $50 already received depends upon the application of the rule previously stated.

13.    At a meeting of the directors of the defendant corporation held in Nashua, February 4, 1896, James Russell, of Mason, was appointed special agent to examine the books, securities, and properties of the corporation wherever found. Under the appointment he rendered services in this state for which he charged $66, and services in North Dakota for which he charged $1,372.14; and for the latter sum he claims a preference of payment, under a North Dakota statute giving a preference for wages.

The claimant has not specified the statute upon which he relies to gain a preference. Whatever the statute may be, it is not seen how it can affect his claim in this proceeding. He is a citizen of the state, the defendants were incorporated and located in the state, and the contract was made, and the proceeding is pending, here. The contract must have been made with reference to the laws of the state, so far as insolvency proceedings are concerned, for this was the jurisdiction in which such proceedings would probably, if not necessarily, be prosecuted. There is no consideration of comity which requires the recognition of a North Dakota statute in the matter. The rights of its citizens or the rights of property within its jurisdiction are not involved in the question. The defendants' assets must be distributed according to the laws of this state, under which they are being collected. The principle applies which governs in the administration of the estates of deceased persons. Story states it as follows: "The established rule now is, that in regard to creditors the administration of assets of deceased persons is to be governed altogether by the law of the country where the executor or administrator acts, and from which he derives his authority to collect them; and not by that of the domicile of the deceased." Sto. Con. Laws, *s.* 524. See, also, Dicey Con.

Laws 674; Whar. Con. Laws, *s.* 654. This state is the domicile of the insolvent, as well as the forum of the proceeding. The claim of preference must be disallowed.

14. The facts relating to the claims of several other creditors are stated in the case, but it is believed that the principles of law herein recognized and stated cover the questions arising upon them and render it unnecessary to make a particular statement of them.

*Case discharged.*

BLODGETT, C. J., and PEASLEE, J., did not sit: the others. concurred.