SANGER N. ANNIS *vs*. SECURITY TRUST COMPANY.

Kennebec.       Opinion, November 30, 1934.

*Harvey D. Eaton,* for Intervenor.
*Locke, Perkins & Williamson,*
*Sanford L. Fogg, Jr.,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

HUDSON, J.    Report on agreed statement of facts. The Security Trust Company is in process of liquidation. One Lionel F. Jealous has intervened as claimant of a preference. His claim "was disallowed by the Special Master." Thereupon the Conservator moved for confirmation of this report. Shall the motion be granted?

The bank "closed March 4, 1933, reopened March 15, 1933, and finally closed April 29, 1933."

The claimant "had on deposit at the Security Trust Company in its Warren Branch on April 28, 1933 — $1,213.78. During that day he deposited check for $6,961.93, drawn on the First National

Bank of Boston. . . . On April 29, 1933, he deposited checks drawn on the First National Bank of Boston for $172.04. . . . The 30th day of April was Sunday and the bank did not open on Monday, as a telegram from the Bank Commissioner was received Monday morning ordering it not to re-open.

"The Security Trust Company had an account with the First National Bank of Boston. The check deposited April 28th was sent to Boston the same day and the Trust Company received credit for same at First National on April 29th. Checks deposited April 29th were sent to Boston and credited to Trust Company May 1st.

"The Trust Company was indebted to the First National Bank of Boston, on certain promissory notes, in the sum of $125,000.00. The Trust Company had on deposit in First National on May 1st the sum of $99,000.00 (including the checks in question). The Trust Company's deposit with First National was offset against indebtedness by First National and the balance due the First National was paid by order of Court on May 11th."

The intervenor claims to recover as a preference the unpaid balance of his said deposits of April 28th and 29th.

Until now we have had no Maine decision involving the rights of a depositor who claims a preference in an alleged hopelessly insolvent bank. In other states there have been many such cases and an examination of them convinces us that the general rule is that acceptance of general deposits by a bank, hopelessly insolvent to the knowledge of its officers, constitutes such a fraud as will entitle the unsuspecting depositor as a preferred creditor to rescind and recover back his money or its proceeds if traced into the hands of one, not an innocent purchaser for value. .

The reasoning underlying these decisions has been correctly and well expressed by Chief Justice Rugg in *Steele* v. *Commissioner of Banks*, 240 Mass., 394, 397, 134 N. E., 401, as follows:

"Acceptance of deposits by a bank is a representation of solvency. A bank hoplessly insolvent receiving deposits from those who confide in its good reputation or in its representations, is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay and is a fraudulent act. The contract of deposit may be rescinded by the depositor and

the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry· on its business and· to recover sound financial standing. To warrant such rescission there must be the further fact that it is reasonably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature and will be obliged to suspend its ordinary operation. The facts must establish the conclusion that the trust company accepted the deposit knowing through its officers that it would not and could not pay the money when demanded by the depositor."

New York, holding with Massachusetts, in dealing particularly with the character of the fraud, has stated:

"It is fraud that must be proved. An honest mistake as to the condition of the bank and an honest belief in the solvency of the institution, if it exists, negative the condition of fraud upon which the plaintiff's cause of action must depend." *Williams* v. *Van Norden Trust Company*, 93 N. Y. Supp., 821, 823, 104 App. Div., 251. Also see *Byrd* v. *Ross*, 58 Fed. (2d), 377 (1932).

"To invoke the rule, plaintiff must prove hopeless insolvency, irretrievable insolvency, and knowledge thereof on the part of the management. This is essential to establish the resultant fraud. Hopeless insolvency refers to insolvency of such character that it is manifestly impossible for the bank to continue in business and meet its obligations; and that fact must be known to the officials so as to justify the conclusion that the deposit was accepted knowing that they would not, and could not, respond on demand of the depositor. It is fraud that is to be proved, not an honest mistake which would negative the conclusion of fraud upon which plaintiff's cause of action must depend." *Forsythe* v. *First State Bank* (Minn.), 241 N. W., 66, 68, 81 A. L. R., 1074 (1932).

The law as above declared and by us adopted must now be applied to the somewhat meager facts contained in the agreed statement. In it there appears no balance sheet showing its assets and liabilities, its solvency or insolvency, either at the time of the bank's closing or at the time of the making of these deposits. We are not apprised as to the character and soundness of its investments. It is admitted, however, that "taking the securities and assets of the bank at book value (which was with the knowledge and acquiescence of the State Bank Commissioner) the bank was solvent" but "taking the securities and assets at market value, the bank was insolvent for a considerable time before it closed."

It may well be that their real true value, which would determine solvency or insolvency, was more than market and less than book value, considering the extent and the effect of such a devastating depression. Their intrinsic value the record does not disclose. If there can be said to appear in it, facts, importing even simple insolvency, with business conditions as they then were, it contains no satisfying evidence that the bank was irretrievably and hopelessly insolvent and that there was no genuine, reasonable hope, expectation and intention on the part of its officers to carry on its business and the bank to recover sound financial standing.

For the purpose of showing hopeless insolvency and knowledge of it by the bank's officers, the claimant relies strongly upon a letter written by the bank to the Bank Commissioner of Maine sometime between March 4 and March 15, 1933, to which letter there was an attached statement showing its savings and demand deposits, its segregated and unsegregated assets, as well as a net depreciation from book value to market of about 20% of its deposits. The purpose of the letter was to obtain from the Bank Commissioner license to re-open, which was granted. In the letter it is stated:

"In the opinion of the officers signing this application, the undersigned Trust Company is solvent. According to the last report of examination this institution, even if all actual market bond depreciation, all doubtful paper and all losses were charged off, would still have assets of sufficient value to more than cover all liabilities other than its own stock liabilities, and if permitted to reopen as requested hereby, will in the

opinion of the officers signing this application be able to continue as a going bank."

A careful examination and analysis of the figures contained in this attached statement do not warrant us in finding as a fact that this bank was hopelessly and irretrievably insolvent and was so known to be by its officers when these deposits were received. If shown actually to be insolvent, it was insolvent in comparatively so small an amount that its officers might have been justified in believing that there would be a return to complete solvency upon a reasonably-to-be-expected upturn in values of securities from the then depth of the depression. A significant and convincing bit of testimony bearing upon the good faith and honesty of one of the officials, as well as showing his confidence in the bank's solvency, is revealed in the fact that the "auditor and the Vice President of the Bank, who knew the condition of the Bank, deposited a month's salary in the commercial department of the Trust Company the morning of April 29th."

The claimant likewise relies upon a tabulation made up of statements, all of which save one, dated November 19, 1932, were sent to the Bank Commissioner subsequently to March 4, 1933, showing "demand deposits, unsegregated assets, and percentage of those assets to those deposits." It is true that from November 19, 1932, to the date of the last statement, April 29, 1933, this tabulation shows a drop from 75% to 39% of the unsegregated assets to the demand deposits. This, however, tells little, if anything, in regard to the financial condition of this bank in the absence of evidence of the amount of the savings deposits and the assets segregated therefor.

Also included in the report are certain votes of the Directors and the Executive Committee, relating to the conduct of the bank's business, the purchase and sale of securities, the segregation of certain assets, and withdrawal of assets from segregation and substitution of other assets therefor, but accompanying these votes there is in the agreed statement no sufficient evidence to show that the votes were taken by the bank when insolvent and certainly not when hopelessly insolvent or from which any reasonable deduction of hopeless insolvency may be drawn, or even what action, if any, was taken as a result of these votes.

On the other hand, we find much evidence in the agreed statement to support the defendant's contention that this bank was not hopelessly insolvent. Thus, it appears that the bank had no pressing creditors or heavy indebtedness. While it owed the Boston bank $125,000.00, this loan was not contracted until after the banking holiday, part of it only within a week before these deposits were made. Besides, it appeared that it had a credit with the Boston bank of nearly the amount of the debt and that the debt was secured by collateral. The ability to obtain this loan, after the holiday, indicates solvency. Since January 1, 1933, its net loss from withdrawals from savings accounts was less than one per cent. The closing of the bank on March 3rd does not indicate insolvency as the cause of it, for it was part and parcel of the general closing of banks, not only in the State but in the Nation. There is no claim that any official of the bank expected the bank to be closed by the Commissioner on May 1st.

When these checks were received for deposit and sent to the Boston bank, it was with full expectation that they would be paid by it and the depositor receive full benefit thereby. Application upon the debt to the Boston bank was not anticipated. Pay day for this debt in the minds of the officers had not arrived.

It has not been made to appear that this bank was in urgent need of funds in order to carry on its usual and customary business. The act of the Bank Commissioner in allowing this bank to reopen on March 15, 1933, militates against the hopeless insolvency of the bank at that time, and thereafter, at least, this bank was in constant communication with the State Banking Department. It is not shown that at any time any misrepresentation was made to the Department or that there was any withholding of any information from it, whose duty it was in the interests of all concerned to inspect closely and discover the bank's true financial condition as to solvency.

These facts tend strongly to show that the bank's officers reasonably believed and expected that it could carry on as usual, meet its obligations, and honor its depositors' accounts.

It should be borne in mind that we are now in equity and the case must be decided on equitable principles. We are not determining the rights of the bank's stockholders on the one side and on the

other its depositors' but equities are being considered and declared between two classes of creditors, both innocent in their dealings with the bank. The allowance of a preference necessarily means less for the unpreferred. Shall the one suffer for the benefit of the other, although each is equally blameless? Yes, but only if the preferred's deposit is received by the bank when it is hopelessly insolvent and its officers know that fact. Then only does the law say that there is such fraud as will enure to the benefit of such a depositor over the other.

Known simple insolvency, that is, when there is a reasonable hope of a return to solvency at the time of the deposit, is not enough to justify and make equitable the creation of a preference, although the receipt of a deposit even then is reprehensible and most certainly is not to be condoned. But it is only when actual hopeless insolvency obtains, with knowledge thereof upon the part of the officers, that the wrong is so great that there is justification for the establishment of a preference at the expense of the general creditor.

We might stop here in this opinion, for in the absence of sufficient proof of hopeless insolvency and knowledge thereof, the intervenor can have no priority. Counsel, however, argued the third claimed essential, viz.: "that it must appear that the deposits came to the Conservator." Because of its importance and the probability that the question will arise out of the mass of present bank liquidations in this state, there heretofore having been no Maine decision on it involving a conservatorship or receivership, we have decided to deal with it.

Many courts out of Maine have held that for the establishment of a preference the trust fund, or its proceeds, must either be identified in the hands of the receiver or conservator or at least be traced in some manner into his hands. The great weight of authority is to that effect. 82 A. L. R., 52 to 58. Indispensably this must appear, else the claimant has the rights only of an ordinary creditor.

"A claimant who seeks a preference by reason of a trust is called upon to prove the existence of the trust. . . . Proving that there was a trust at one time in particular property does not prove that the trust is impressed upon other property at a

later time, without showing that the latter is the proceeds or substitute of the former. . . . The money may have been lost, used in the payment of expenses or debts, or invested in securities which turned out to be worthless. The payment of debts with the money would simply transfer the defendants' indebtedness from one person to another. It would not increase the value of their estate as a whole, or the value that would be left after the payment of debts. The money would go into the debt, and if a trust was impressed upon anything by the change it must be upon that. This, however, would be of no practical benefit to the beneficial owner of the money unless the debt was secured in some way. In that event the debt with its security, if in existence, might be revived and charged with a trust in his favor. . . . From these considerations it appears that it is necessary to trace the money through the various changes in its investment to specific property, in severalty or in mass, in the possession of the assignee, to create a trust or charge in favor of the claimant. The tracing is a matter of fact, not law." *Bank Commissioner* v. *Security Trust Co.*, 70 N. H., 536, 550, 551, 49 A., 113, 121.

The doctrine of this New Hampshire case is confirmed in *Sloane* v. *Peoples Trust Company, et al.*, 83 N. H., 583, 145 A., 670.

"According to the overwhelming weight of authority, the extent of the cestui que trust's preferential recovery is limited to the trust property that he can trace into the assets of the insolvent estate, and no right of recovery or priority exists if the trust property can not be traced into, or identified as, some specific fund or thing forming part of the estate of the insolvent trustee." 65 C. J., Section. 909, pages 982, 983.

In support thereof are cited many cases. The reason for this principle is aptly stated in *Slater* v. *Oriental Mills*, 27 A., 443, 18 R. I., 352, as follows:

"Undoubtedly, it is right that every one should have his own; but, when a claimant's property cannot be found, this same principle prevents the taking of property which equitably belongs to creditors of the trustee to make it up. The

creditors.have done no wrongful act, and should not be called upon, in any way, to atone for the misconduct of their debtor. It is an ordinary case of misfortune on the part of claimants, whose confidence in a trustee or agent has been abused."

Massachusetts holds to the same effect and requires the tracing of the trust property into some other specific property or fund as distinguished from the general assets of the estate. *Lowe* v. *Jones*, 192 Mass., 94, 78 N. E., 402, 404.

"When, as a matter of fact, it cannot be traced, the equitable right of the cestui que trust to follow it fails. Under such circumstances, if the trustee has become bankrupt, the Court cannot say that the trust money is to be found somewhere in the general estate of the trustee that still remains; he may have lost it with property of his own; and in such case the cestui que trust can only come in and share with the general creditors." *Little* v. *Chadwick*, 151 Mass., 109, 110, 23 N. E., 1005.

Our own Court in *Sawyer* v. *Sawyer*, 119 Me., 87, 89, 109 A., 378, has stated:

"It is settled law that the identity of the trust fund having been lost the beneficiaries can stand in no better position than other creditors. . . . As was said in *Little* v. *Chadwick*, supra, 'the Court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it can not be traced, the equitable right of the cestui que trust to follow it fails.' "

Let us now trace the deposits in the instant case. The checks immediately upon deposit were sent by the defendant Trust Company to Boston and there, before failure and the appointment of the conservator, credited to its account by its correspondent Boston bank. Thus, then and there the original trust property was dissipated and never as such came into the hands of the conservator.

It appears, however, that the debt in part reduced by these checks was secured by collateral and that ultimately, by order of Court, the balance due on it was paid by the conservator.

"While, according to the great weight of authority, the use of trust funds to pay the debts of the trustee bank amounts to a dissipation of the funds and does not augment the assets coming into the hands of the bank's receiver, it is well settled that where the trust fund is used to redeem the bank's property from a lien or pledge on account of the bank's indebtedness to another bank, the property thus redeemed, *where recovered by the receiver of the trustee bank,* is subject to the trust." 82 A. L. R., 121, *State ex rel Rankin* v. *Montana Banking Corp.,* 77 Mont., 134, 251 Pac., 151.

And so it is held where such an indebtedness is reduced in part by trust funds and in part by money belonging to the trustee bank, *the collateral returned to the receiver* is impressed with a trust to the extent to which the trust money had contributed to the payment of the indebtedness secured thereby, the presumption being that no more of the trust money was used in discharging the obligation than necessary to make up the balance due after applying all that part of the deposit belonging to the trustee bank and that the balance *turned over to the receiver* was the money of the cestui que trust. *Fokken* v. *State Bank & Trust Co.,* 52 S. D., 342, 217 N. W., 512.

The foregoing principles of law may now be applied to the facts in this case. Had the Security Trust Company been hopelessly insolvent within the knowledge of its officers, (an assumption contrary to proven fact) it had no right to accept these checks for deposit. Doing so, it would perpetrate a fraud on the depositor and thus hold the deposits in trust for the depositor. As trustee, then, it would have had no right to have had these deposits credited on its indebtedness to the Boston bank, although the Boston bank, acting in good faith and without knowledge of the trust, would have had the right so to apply them. Such a legal application would have ended the existence of the trust fund itself. The fund would have merged in the debt and become dissipated in it. Later, however, the payment of the secured debt and the consequent release of its collateral would have then created a new right in the intervenor to impress a trust upon it, if traced into the hands of its conservator.

This agreed statement contains insufficient facts to show such a tracing. It contains no definite statement as to what became of this security when and if it did pass out of the possession of the Boston bank. It is entirely silent as to what it was and its value. If the collateral had no value, it might or might not have passed to the conservator. If it were bank stock, subject to a declared assessment, it would have been a liability rather than an asset, and in such an event most likely would not have been taken over by the conservator though the debt were paid. Redemption by the conservator was not compulsory as a matter of law.

It is not a defensible proposition to claim that the conservator upon payment of the debt must be presumed to have taken into his possession the security, especially where it does not appear to be advantageous so to do. In such a situation, where the claimant is setting up a preference as against other innocent depositors, he is not entitled in equity to such a presumption. Furthermore, the record informs us in no way as to how this debt was paid. We do not know that this collateral was not sold by the Boston bank and applied to the debt, (as it had previously applied the deposits to the same debt) and that the conservator did not pay the then balance of the debt. If this were done, the security never came into the hands of the conservator.

The fact is that the agreed statement permits us only to grope in the dark, merely to surmise in attempting to follow this collateral, and does not furnish enough facts on which to warrant a reasonable inference even, that it ever actually came into the hands of the conservator. The burden of proof to have traced this collateral into the conservator's hands was on the intervenor, a burden which he did not sustain.

In conclusion, it may be stated that the decision of the Master in disallowing the preference has the effect of a jury verdict and so, unless it be clearly wrong, it must stand. *Stewart* v. *Grant*, 126 Me., 195, 137 A., 63. Such wrong not having been made to appear, we hold that the Special Master's Report should be confirmed.

*Cause remanded to the sitting Justice for a decree in accordance with this opinion.*